No. 24-1994

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

---

**Emily Elizabeth Lazarou, and Aafaque
Akhter, individually and on behalf
of all others similarly situated**

$\qquad$ **Plaintiffs-Appellants,**

    **v.**

**American Board of Psychiatry
and Neurology,**

$\qquad$ **Defendant-Appellee.**

---

**Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division,
Case No. 1:19-cv-01614
The Honorable Judge Jeremy C. Daniel**

---

## BRIEF AND REQUIRED SHORT APPENDIX
## OF PLAINTIFFS-APPELLANTS

---

C. Philip Curley
Robert L. Margolis
ROBINSON CURLEY P.C.
600 West Van Buren Street, Suite 700
Chicago, IL 60607
Tel: 312.663.3100
pcurley@robinsoncurley.com
rmargolis@robinsoncurley.com
    *Attorneys for Plaintiffs-Appellants*

Oral Argument Requested

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 24-1994

Short Caption: Lazarou, et al., individually and on behalf of all others simiarly situated v. Am. Board of Psychiatry and Neurology

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[ ]     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Emily Elizabeth Lazarou, Aafique Akhter, individually and on behalf of all others similarly situated

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Robinson Curley, PC; Lite DePalma Greenberg, LLC; Carlson Lynch LLP

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

    N/A

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

    N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: s/ C. Philip Curley     Date: 6/24/24

Attorney's Printed Name: C. Philip Curley

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   Yes [✓]   No [ ]

Address: Robinson Curley PC, 200 North LaSalle Street, Suite 1550, Chicago, IL 60601

Phone Number: (312) 546-5202     Fax Number: (312) 663-3100

E-Mail Address: pcurley@robinsoncurley.com

rev. 12/19 AK

i

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 24-1994

Short Caption: Lazarou, et al., individually and on behalf of all others simiarly situated v. Am. Board of Psychiatry and Neurology

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐  **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
Emily Elizabeth Lazarou, Aafique Akhter, individually and on behalf of all others similarly situated

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
Robinson Curley, PC; Lite DePalma Greenberg, LLC; Carlson Lynch LLP

(3)    If the party, amicus or intervenor is a corporation:

i)    Identify all its parent corporations, if any; and
N/A

ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:
N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:
N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:
N/A

Attorney's Signature: s/ Robert L. Margolis          Date: 6/24/24

Attorney's Printed Name:  Robert L. Margolis

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ☐    No ☑

Address:  Robinson Curley PC, 200 North LaSalle Street, Suite 1550, Chicago, IL 60601

Phone Number: (312) 546-5213          Fax Number:  (312) 663-3100

E-Mail Address: rmargolis@robinsoncurley.com

rev. 12/19 AK

# TABLE OF CONTENTS

**Page**

DISCLOSURE STATEMENTS ................................................................. i

TABLE OF CONTENTS ..................................................................... iii

TABLE OF AUTHORITIES ................................................................... v

JURISDICTIONAL STATEMENT ............................................................ 1

STATEMENT OF THE ISSUE .............................................................. 1

STATEMENT OF THE CASE ............................................................... 2

I.     Statement of Facts .................................................................. 2

    A.     The Parties and Product Markets ....................................... 2

    B.     CME Products and State Licensure Requirements .......... 4

    C.     The Interstate Medical Licensure Compact ..................... 5

    D.     ABPN's Maintenance of Certification Product ................. 6

    E.     MOC Is A Substitute For Other CME Products ............... 8

II.    Course of Proceedings .......................................................... 11

SUMMARY OF ARGUMENT ............................................................... 13

STANDARD OF REVIEW ................................................................... 16

ARGUMENT ..................................................................................... 16

I.     Standard on Rule 12(b)(6) Motion to Dismiss ........................ 16

II.   The Second Amended Complaint Satisfies *Siva* And
      Plausibly Alleges MOC Is A Substitute For Other
      CME Products ................................................................... 19

      A.   MOC Contains Educational Content .................................. 21

      B.   Doctors Use MOC To Meet State CME
           Licensure Requirements ...................................................... 23

           1.   Doctors Earn Category 1 Credits From ABPN's
                Assessment Products ................................................. 24

           2.   States Accept MOC In Place Of Their CME
                Requirements ............................................................. 34

      C.   MOC Does Not Impose A Redundant Obligation .............. 42

III.  Plaintiffs Have Antitrust Standing ............................................. 46

IV.   Upon Reinstatement of the Sherman Act Claims, Plaintiffs'
      Unjust Enrichment Claim Also Should Be Reinstated .............. 51

V.    Because The SAC Was The First Opportunity To Address
      *Siva*, If This Court Decides Specific Evidentiary Details
      About Individual State CME Requirements Should Have
      Been Pleaded, Plaintiffs Request Leave to Amend To Do So ..... 51

CONCLUSION ..................................................................................... 53

CERTIFICATE OF COMPLIANCE WITH F.R.A.P. 32(a)(7)(B) ........ 55

CERTIFICATE OF COMPLIANCE WITH CIRCUIT RULE 30 ......... 55

CERTIFICATE OF SERVICE ................................................................ 56

# TABLE OF AUTHORITIES

**Cases**                                                                                    **Page**

*3M Co. v. Prybil,*
    259 F.3d 587 (7th Cir. 2001) ..................................................... 26

*Allen-Myland, Inc. v. Intl. Business Machines Corp.,*
    33 F.3d 194 (3rd Cir. 1994) ..................................................... 26

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) .................................................... 16, 17, 18

*Blanchard & Assocs. v. Lupin Pharm., Inc.,*
    900 F.3d 917 (7th Cir. 2018) ...................................................16

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) ........................................................... 17, 18

*Brown Shoe Co. v. United States,*
    370 U.S. 294 (1962) .................................................... 26

*Carlson v. CSX Transp., Inc.,*
    758 F.3d 819 (7th Cir. 2014) ........................................... 18, 39

*E.I. DuPont de Nemours v. Kolon Indus.,*
    637 F.3d 435 (4th Cir. 2011) .................................................... 49

*Eastman Kodak Co. v. Image Technical Services, Inc.,*
    504 U.S. 451 (1992) ........................................................ 18, 49

*Envirosource, Inc. v. Horsehead Resource Dev. Co.,*
    No. 95 Civ. 5106 (TPG), 1997 U.S. Dist. LEXIS 12570
    (S.D.N.Y. Aug. 20, 1997) ........................................................ 19

*Exergen Corp. v. Wal-Mart Stores, Inc.,*
    575 F.3d 1312 (Fed. Cir. 2009) ............................................... 32

*Firestone Fin. Corp. v. Meyer*,
    796 F.3d 822 (7th Cir. 2015) ....................................... 16, 17, 18

*Geinosky v. City of Chicago*,
    675 F.3d 743 (7th Cir. 2012) .................................................. 41

*Glover v. Carr,*
    949 F.3d 364 (7th Cir. 2020) ................................................... 52

*Gociman v. Loyola Univ. of Chi.*,
    41 F.4th 873 (7th Cir. 2022) ................................................... 16

*Gogos v. AMS Mech. Sys., Inc.*
    737 F.3d 1170 (7th Cir. 2013) ................................................ 16

*Gorlick Distribution Ctrs. LLC v. Car Sound Exhaust Sys.*,
    723 F.3d 1019 (9th Cir. 2013) ................................................ 26

*Heng v. Heavner, Beyers & Mihlar, LLC*,
    849 F.3d 348 (7th Cir. 2017) ............................................. 40, 46

*Highsmith v. Chrysler Credit Corp.*,
    18 F.3d 434 (7th Cir. 1994) ................................................... 41

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*,
    466 U.S. 2 (1984) ................................................................. 30

*Newcomb v. Brennan*,
    558 F.2d 825 (7th Cir. 1977) .................................................. 41

*Poppell v. City of San Diego*,
    149 F.3d 951 (9th Cir. 1998) ................................................. 32

*Reed v. Palmer*,
    906 F.3d 540 (7th Cir. 2018) .................................................. 17

*Reifert v. South Central Wisconsin MLS Corp.*,
    450 F.3d 312 (7th Cir. 2006) ............................................. 20, 30

*Richards v. Mitcheff,*
    696 F.3d 635 (7th Cir. 2012) .................................................. 17

*SD3, LLC v. Black & Decker (U.S.) Inc.,*
    801 F.3d 412 (4th Cir. 2015) .................................................. 18

*Siva v. Am. Bd. of Radiology,*
    38 F.4th 569 (7th Cir. 2022) ............................................ *passim*

*St. Anthony Hosp. v. Whitehorn,*
    100 F.4th 767 (7th Cir. 2024) .................................................. 41

*Tamayo v. Blagojevich,*
    526 F.3d 1074 (7th Cir. 2008) ................................................ 17

*Todd v. Exxon Corp.,*
    275 F.3d 191 (2nd Cir. 2001) ................................................ 49

*United States v. McCormick,*
    309 F.2d 367 (7th Cir. 1962) .............................................. 41-42

*Viamedia, Inc. v. Comcast Corp.,*
    951 F.3d 429 (7th Cir. 2020) ...................................... 11, 19, 52

*Zimmerman v. Bornick,*
    25 F.4th 491 (7th Cir. 2022)..................................................... 20

## **Statutes**

15 U.S.C. § 1  .......................................................................... 11, 12

15 U.S.C. § 2  .............................................................................. 11

15 U.S.C. § 15 ............................................................................... 1

15 U.S.C. § 16 ............................................................................... 1

28 U.S.C. § 1291 ................................................................... 1

28 U.S.C. § 1331.................................................................... 1

28 U.S.C. § 1337 ................................................................... 1

28 U.S.C. § 1367 ................................................................... 1

Fed. R. of App. P. 4(a)(1)(A) ............................................. 1

Fed. R. Civ. P. 12(b)(6) .................................... 16, 17, 18, 48

Fed. R. Civ. P. 15(a)(2) .................................................... 52

Fed. R. Evid. 201(d) ......................................................... 42

## **Other**

*Black's Law Dictionary* (10th ed. 2014) ........................... 32

25 *GAR Prof. & Voc. Regs.,* § 11101(g)(9) ......................... 44

*Haw. Admin. R.* § 16-85-33(3)........................................... 32

*Ill. Admin. Code* Title 68, Section 1285.110(a) ............. 4, 43

*Kan. Admin. Reg.* § 100-15-5(B)........................................ 44

243 *Code Mass. Reg.* 2.06(6)(a) .................................... 4, 32

*Mich. Admin. Rules* 338.2441(2) ................................. 38, 43

*Mich. Admin. Rules* 338.2443(2)(b) ................................. 38

1 *N.H. Code Admin. Med.* 402.01(a) ............................ 36, 43

1 *N.H. Code Admin. Med.* 402.01(i) .................................. 36

*N.J. Admin. Code* 13:35-6.15 ............................................................. 44

49 *Pa. Code* § 16.19(b) ................................................................. 37, 44

49 *Pa. Code* § 16.19(b)(2)(i)(c) ........................................................ 37

*WAC* 249-919-430(4)....................................................................... 37, 43

## JURISDICTIONAL STATEMENT

The District Court had subject matter jurisdiction under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 16, and 28 U.S.C. §§ 1331, 1337, and 1367.

Appellate jurisdiction exists pursuant to 28 U.S.C. § 1291, because this is an appeal from a final order (Dkt. 108) and judgment (Dkt. 109) dismissing all claims against the only defendant in the case and denying leave to amend. A-1, 2-21.[1]

This appeal is timely pursuant to Federal Rule of Appellate Procedure 4(a)(1)(A), as the Notice of Appeal was filed on June 7, 2024 (Dkt. 110), within 30 days of the final dismissal Order entered on May 13, 2024.

## STATEMENT OF THE ISSUE

Whether the District Court erred in dismissing Plaintiffs' tying claims when it found Plaintiffs failed to plausibly allege that Defendant-Appellee American Board of Psychiatry and Neurology's ("ABPN")

---

[1]     "Dkt. ___" refers to the District Court docket number in this case. "A- __" refers to pages of the Appendix attached to this Brief.

maintenance of certification ("MOC") product is a continuing medical education ("CME") product.

## STATEMENT OF THE CASE

**I.    Statement of Facts.**

      A.    The Parties and Product Markets.

Defendant ABPN is a medical specialty board and a member of the American Board of Medical Specialties ("ABMS"). (¶¶ 21, 24).[2] ABMS medical specialty boards sell certifications in approximately forty specialties to recent residency graduates. (¶ 24)).[3] ABPN sells certifications in psychiatry nationwide to residency graduates who successfully complete the ABPN certification examination. (¶ 2).  ABPN is the monopoly supplier of certifications for psychiatrists and holds significant market power in the nationwide certification product market. (¶ 3). Certifications are an economic necessity and doctors without

---

[2]    References to "¶ ___ " are to paragraphs of the Second Amended Class Action Complaint ("SAC") (Dkt. 94), included in the Separate Appendix at SA-1-51.

[3]    All ABMS Member Boards also sell a MOC product, and like ABPN each revokes the certifications of doctors who do not buy MOC. (¶ 24). ABMS Member Boards in total, including ABPN, have authority over approximately 900,000 doctors nationwide, approximately 90 percent of all doctors in the United States. (¶ 25).

certifications are at a major economic and career disadvantage. (¶¶ 4, 55-57, 64-70). [4]

Plaintiffs Emily Elizabeth Lazarou ("Dr. Lazarou") and Aafaque Akhter ("Dr. Akhter") are psychiatrists. (¶ 1). Dr. Lazarou bought an ABPN certification in psychiatry in 2007 after completing her residency. (¶¶ 18, 158). Dr. Akhter bought an ABPN certification in psychiatry in 2005 after completing his residency. (¶¶ 19, 173). Doctors owning ABPN certifications are referred to as "diplomates." (¶ 40).

There is also a nationwide product market for continuing medical education ("CME") products. (¶ 5). CME products promote individual, self-directed lifelong learning and the continued development of medical and non-medical competencies after residency. (¶ 76). Certification products are separate from CME products. (¶¶ 77, 79, 188-191; *see Siva v. Am. Bd. of Radiology,* 38 F.4th 569, 578 (7th Cir. 2022)). ABPN forces diplomates to buy its own CME product, called maintenance of certification ("MOC"), by revoking the certifications of diplomates who do not buy MOC. (¶¶ 11, 24).

---

[4]     ABPN also sells certifications to neurologists, and requires them to buy MOC or forfeit their certifications. ABPN's anti-competitive acts alleged herein are equally applicable to its conduct toward neurologists.

B.    CME Products and State Licensure Requirements.

Because virtually all states require doctors to earn CME credits to be licensed (¶ 34), demand for CME products is "driven largely by state licensing requirements." *Siva*, 38 F.4th at 579. The American Medical Association ("AMA") recognizes two types of CME credits used for state licensure, Category 1 credits (relevant here) and Category 2 credits. (¶ 80). Different states require different amounts of CME credits over different periods of time. For example, Illinois (in which Dr. Lazarou is licensed) requires 150 CME credits *every three years* (50 *per* year on average), all of which can be Category 1 credits. (¶¶ 83, 157; *Ill. Admin. Code* Title 68, Section 1285.110(a)). Similarly, Massachusetts (in which Dr. Akhter is licensed) requires 100 CME credits *every two years* (also 50 per year on average), all of which can be Category 1 credits. (¶ 172; 243 *Code Mass. Reg.* 2.06(6)(a)).

Doctors can earn CME Category 1 credits by purchasing CME products accredited by the Accreditation Council for Continuing Medical Education ("ACCME") or ACCME-recognized State or local medical societies. (¶ 81). CME products earning Category 1 credits were sold by

other CME providers for decades before ABPN started forcing diplomates to buy MOC. (¶¶ 29, 75-79, 100).

Diplomates also earn Category 1 direct credits through the AMA from ABPN's own MOC-required assessment products, as described more fully below. (¶¶ 82, 101, 120, 199(e)). These direct credits can be applied by doctors toward state CME requirements nationwide. (¶¶ 82, 120, 177 (Dr. Akhter), 199(e)). As a separate matter, many states, without CME Category 1 status being obtained, accept either participating in MOC or passing a MOC examination, in full or partial satisfaction of CME requirements; these states include, as "examples," California, Idaho, Kentucky, Michigan, Minnesota, New Hampshire, Oregon, and West Virginia. (¶¶ 119, 121, 199(g)).

C.     The Interstate Medical Licensure Compact.

The Interstate Medical Licensure Compact ("Interstate Compact") provides a means for doctors licensed in one state to obtain licensure in other states by submitting a short application form and paying certain fees to the Interstate Compact and to the other states in which licenses are being obtained. (¶¶ 123-124). Doctors licensed in one state can utilize the Interstate Compact to become licensed in other states regardless of

the CME requirements of the other member states. As of the filing of the SAC, 35 states had joined the Compact, and legislation to join the Compact was pending in eight other states. (¶ 124).

D.    ABPN's Maintenance of Certification Product.

ABPN sells a product it calls maintenance of certification ("MOC"). (¶¶ 90, 98-106, 114-115). Parroting the AMA definition of CME products, ABPN describes MOC as promoting "lifelong learning through continuing medical education and other educational programs." (¶ 7). ABPN has explained MOC as a reaction to the concern that "many players" had entered "the arena of assessment," that ABPN "will continue to be challenged from the outside," and that MOC would "eliminate the need for such [outside] intervention." (¶ 92).

MOC is a CME product that like other CME products promotes lifelong learning, except ABPN revokes the certifications of diplomates who do not buy MOC. (¶ 96). ABPN sells MOC only to doctors who have already purchased its certifications and refuses to sell MOC to doctors without certifications who may want to buy it to earn Category 1 credits for licensure or otherwise apply it toward license requirements. (¶ 97).

ABPN requires diplomates to pay a $175 annual MOC fee or forfeit their certifications. (¶ 99).

One component of MOC, called "Activity Requirements" by ABPN, requires diplomates to complete 90 Category 1 credits every three years (30 per year on average), 24 of which must be SA CME Category 1 credits (eight per year on average). (¶ 100). A second component of MOC, called "Assessment" by ABPN, requires diplomates to use one of its own assessment products, either the ABPN "Article-Based Pathway" ("Article Pathway") or the ABPN "10-Year Recertification Exam" ("Exam Pathway"). (¶ 101).

The Article Pathway requires diplomates to correctly answer four out of five multiple choice questions developed by ABPN associated with a medical journal or other article selected by ABPN. (¶ 102). Thirty ABPN article examinations must be successfully completed during a three-year cycle. (*Id*.). The Exam Pathway is a secured, proctored, full-day, high stakes, closed-book examination developed and administered by ABPN and taken every ten years. (¶ 103). Dr. Akhter used the Exam Pathway to obtain 60 hours of Category 1 direct credits from the AMA, "over and above" the Category 1 credits required to meet ABPN's Activity

7

Requirements, which he used to meet state licensure requirements instead of buying other CME products from other CME vendors. (¶ 177).

ABPN waives 16 of the SA CME Category 1 credits required by MOC Activity Requirements for diplomates using the Article Pathway. (¶ 105). By doing so, ABPN substitutes its own Article Pathway assessment product for 16 MOC-required CME Category 1 credits sold by other CME providers. (*Id*.)  ABPN also waives eight of the SA CME Category 1 credits required by MOC Activity Requirements for diplomates using the Exam Pathway. (*Id*.). By doing so, ABPN substitutes its own Exam Pathway assessment product for eight MOC-required CME Category 1 credits sold by other CME vendors. (*Id*.).

E.    MOC Is A Substitute For Other CME Products.

MOC and other CME products have the same purpose. (¶ 193). The AMA defines CME products as "consisting of educational activities which serve to maintain, develop, or increase the knowledge, skills, and professional performance and relationships that a physician uses to provide services to patients, the public or the profession." (*Id*.) ABPN describes MOC in much the same fashion, as promoting "lifelong learning through continuing medical education and other educational programs,

and some assessment of practice-based performance." (*Id*.) The goal of MOC, like other CME products, is to promote life-long learning for doctors after residency and certification. (¶¶ 28, 92). The ACCME collaborates with ABMS Member Boards "to facilitate the integration of CME and MOC." (¶ 31).

MOC, like other CME products, provides CME credit for state licensure. It does so in two different ways, directly through the AMA (¶¶ 82, 101, 120, 199(e)), and by states accepting MOC in place of CME requirements (¶¶ 119, 121, 199(g)). As stated by the New England Journal of Medicine, MOC is a "viable way" to "pick up bonus points" for a doctor's "licensure." (¶ 118). Thus, doctors (the consumers) view MOC as reasonably interchangeable with other CME products, recognizing they serve the same purpose and are commercial substitutes. (¶¶ 122, 199(a)).

Stakeholders in the CME marketplace in addition to doctors also view MOC as a substitute for other CME products. (¶ 199). ABPN (the seller) promotes MOC as a CME product, describing it as "lifelong learning through continuing medical education and other educational programs" (¶ 7), and substitutes its own assessment products (the Article

Pathway and the Exam Pathway) for Category 1 credits sold by others that are otherwise required by MOC Activity Requirements. (¶ 105).

The AMA, which developed and implemented the CME credit system, gives Category 1 direct credit for ABPN's assessment products that can be applied by doctors toward state CME requirements nationwide. (¶¶ 82, 101, 177 (Dr. Akhter), 199(e)). And many states accept either participating in MOC or passing a MOC examination, in full or partial satisfaction of CME requirements. (¶¶ 119, 121, 199(g)).

Because demand for CME products is "driven largely by state licensing requirements," *Siva*, 38 F.4th at 579, and MOC has the same purpose and goal as other CME products, and since doctors are price sensitive, but for ABPN's tying of certifications and MOC the cross elasticity of MOC and other CME products would be high. (¶ 201). In other words, a price increase in MOC would lead to significant switching by doctors to other CME products, except that ABPN would revoke their certifications.

Absent ABPN's tie and loss of their certifications, doctors would buy other CME products from different vendors in place of MOC. (¶¶ 117, 159 (Dr. Lazarou), 174 (Dr. Akhter), 202). According to the ACCME, since in

or about 2005 when ABPN and other ABMS Member Boards began selling MOC, through November 2023, the number of CME providers accredited by ACCME has declined almost 40 percent from 2,322 to 1,414. (¶ 217). According to its Forms 990, ABPN's MOC revenue increased exponentially from $761,650 in 2013 to $9,580,374 in 2022 (the only years ABPN has publicly disclosed MOC data), or approximately 1,257 percent. (¶ 146).

## II.  Course of Proceedings.

Plaintiffs filed their Class Action Complaint ("initial Complaint") on March 6, 2019, in the Northern District of Illinois, alleging illegal tying and monopolization under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and unjust enrichment. Dkt. 1. On September 11, 2020, the District Court granted ABPN's motion to dismiss, holding that "certification and MOC are not distinct products, but just one [product]— ABPN certification," and granted leave to amend. Dkt. 60, at 8.[5]

---

[5]    The District Court's ruling that certification and MOC constituted a single product was based on a post-tie analysis. This Court in *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429 (7th Cir. 2020), later rejected such an analysis and held that a pre-tie analysis must be used. *See infra* pp. 19-20.

Plaintiffs filed their First Amended Class Action Complaint ("FAC") on January 24, 2020, alleging illegal tying under Section 1 of the Sherman Act, 15 U.S.C. § 1, and unjust enrichment. Dkt. 63. On October 4, 2023, the District Court granted ABPN's motion to dismiss, holding that Plaintiffs had again "failed to allege that MOC and certification are separate products," and granted leave to amend. Dkt. 87, at 15.

Plaintiffs filed their Second Amended Class Action Complaint ("SAC") on December 15, 2023, alleging illegal tying under Section 1 of the Sherman Act, 15 U.S.C. § 1 and unjust enrichment. Dkt. 94. On May 13, 2024, the District Court granted ABPN's motion to dismiss, holding Plaintiffs had "failed to plead sufficient facts to suggest MOC is a CME product," and denied leave to amend. A-18.

## SUMMARY OF ARGUMENT

In a similar case involving the sale of MOC by another ABMS Member Board, this Court found that certifications and CME products are separate products. *Siva,* 38 F.4th at 576. Plaintiffs allege MOC is a CME product and that ABPN illegally ties MOC to its certification product. (*E.g.*, ¶¶ 6-7, 10, 75-76, 91, 96-98, 186, 192-203, 208). ABPN "does not dispute that certification and CME [products] occupy distinct product markets, [or] that [ABPN] has a monopoly in the certification market." A-7. Thus, the sole issue in this appeal is whether MOC is plausibly alleged to be a CME product. Plaintiffs believe it is. The District Court disagreed.

As the District Court observed, to show MOC competes in the CME market, "[p]er *Siva*," facts must be alleged "making it plausible that MOC is a substitute for other [CME] products." A-8. The SAC includes all of the factual allegations called for in *Siva* demonstrating that MOC is a CME product: MOC has educational content, doctors earn CME credit for MOC, and MOC is not redundant of other CME requirements. Despite these well-pleaded allegations, the District Court made the improper factual findings that MOC "is clearly a poor substitute" (A-12) and "an

13

implausible substitute" (A-14) for other CME products. Whether MOC is a reasonable or poor substitute, or a plausible or implausible substitute presents issues of fact requiring development of a full evidentiary record, including expert analysis and testimony, that should not be decided as a matter of law at the pleading stage.

In support of its improper factual findings, the District Court failed to take Plaintiffs' factual allegations as true. For example, to show MOC's substitutability for other CME products, Plaintiffs allege that Dr. Akhter earned 60 hours of Category 1 direct credits from the AMA from one of ABPN's required assessment products, the Exam Pathway, and that he "used these additional credits to meet State licensure requirements." (¶ 177). This restrained competition for CME products because Dr. Akhter did not need to buy CME products for those 60 credits from other CME providers for licensure. The District Court, however, questioned the allegation by claiming that, "the complaint gives no indication of whether he earned direct credit by *studying* for the Recertification Examination, or from *taking* the exam itself." A-11 (emphasis in original). In fact, it was neither. Rather, the clear allegation is that Dr. Akhter earned the credits "[a]fter *passing* the ten-year MOC

examination." (¶ 177; emphasis added). The District Court then failed to accept as true Dr. Akhter's allegation (¶ 177) that he "used these additional credits to meet State licensure requirements." A.-11-12.

As another example, the District Court also failed to accept as true Plaintiffs' allegations that, "some States accept … MOC in lieu of compliance with CME requirements for licensure altogether" (¶ 119), and that, "In other States, passing a MOC examination is a substitute for some or all of the State's CME requirements" (¶ 122). It instead concluded that those allegations "do not move the needle as to the sufficiency of plaintiffs' tying claims," for the totally irrelevant reason that "there are no allegations that any state *requires* MOC to maintain state licensure." A-15 (emphasis in original). The fact that states accept MOC in place of CME requirements shows it is a substitute for other CME products, regardless of whether states may require MOC. In other words, MOC can be a substitute without being required.

Plaintiffs have plausibly alleged that MOC is a substitute for other CME products. The District Court's holdings to the contrary ignore well-pleaded factual allegations, demand a level of evidentiary detail not required by pleading jurisprudence, fail to consider all allegations and

inferences in the light most favorable to Plaintiffs, and is based on inappropriate adverse inferences, all culminating in the improper factual findings that MOC is a "poor" and "implausible" substitute for other CME products.

## STANDARD OF REVIEW

This Court's review of a district court's dismissal of a complaint under Rule 12(b)(6) for failure to state a claim is *de novo*. *Blanchard & Assocs. v. Lupin Pharm., Inc.*, 900 F.3d 917, 921 (7th Cir. 2018).

## ARGUMENT

### I.    Standard on Rule 12(b)(6) Motion to Dismiss.

"At the motion to dismiss stage for failure to state a claim, [courts] test the sufficiency of the complaint, not the merits of a case." *Gociman v. Loyola Univ. of Chi.*, 41 F.4th 873, 885 (7th Cir. 2022). "To survive a motion to dismiss under Rule 12(b)(6), 'a complaint must allege sufficient factual matter to state a claim to relief that is plausible on its face.'" *Firestone Fin. Corp. v. Meyer*, 796 F.3d 822, 826 (7th Cir. 2015) (quoting *Gogos v. AMS Mech. Sys., Inc.*, 737 F.3d 1170, 1172 (7th Cir. 2013), and *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

"Applying [the *Iqbal*] standard, [this Court] first accept[s] all well-pleaded facts in the complaint as true and then ask[s] whether those facts state a plausible claim for relief." *Firestone*, 796 F.3d at 826. *See also Reed v. Palmer*, 906 F.3d 540, 549 (7th Cir. 2018) (on Rule 12(b)(6) motion, well-pleaded factual allegations are to be "taken as true and considered in the light most favorable" to plaintiff). A district court must also draw "all possible inferences in [plaintiff's] favor." *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008).

"As this analysis suggests, the plausibility standard does not allow a court to question or otherwise disregard nonconclusory factual allegations simply because they seem unlikely." *Firestone*, 796 F.3d at 827 (reversing dismissal where plaintiff's "allegations are neither legal assertions nor conclusory statements [merely] reciting the elements of a cause of action. As such, they are entitled to a presumption of truth"). Similarly, "neither *Twombly* nor *Iqbal* has changed the rule that judges must not make findings of fact at the pleading stage … [and] cannot reject a complaint's plausible allegations by calling them 'unpersuasive.' Only a trier of fact can do that, after a trial." *Richards v. Mitcheff*, 696 F.3d 635, 638 (7th Cir. 2012).

17

A complaint that invokes a recognized legal theory (as this one does) and contains plausible allegations on the material issues (as this one does) cannot be dismissed under Rule 12(b)(6). "The relevant question [under *Iqbal* and *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)] is *not* whether a complaint's factual allegations are true, but rather whether the complaint 'contain[s] sufficient factual matter, *accepted as true*, to 'state a claim to relief that is plausible on its face.'" *Firestone*, 796 F.3d at 827 (quoting *Iqbal*, 556 U.S. at 678) (emphasis in original). And "of course," meeting this standard does not require "evidence … at the pleading stage." *Carlson* v. *CSX Transp., Inc.*, 758 F.3d 819, 827 (7th Cir. 2014); *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 431 (4th Cir. 2015) ("we have already expressly refused to impose such a requirement" for "an antitrust plaintiff to plead evidence").

The issue in this appeal is whether MOC is plausibly alleged to be a CME product. Whether a product falls within the relevant product market is a highly fact-intensive inquiry typically not resolvable on a Rule 12(b)(6) motion. *See*, *e.g.*, *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451, 482, 112 S. Ct. 2072, 2090 119 L.Ed.2d 265 293-294 (1992) ("the proper market definition ... can be determined only

after a factual inquiry into the commercial realities faced by consumers."); *Envirosource, Inc. v. Horsehead Resource Dev. Co.*, 95 Civ. 5106 (TPG), 1997 U.S. Dist. LEXIS 12570, *8 (S.D.N.Y. August 20, 1997) ("[e]xtensive analyses of reasonable interchangeability and cost-elasticity of demand ... are not required at the pleading stage ... [m]arket definition ... is generally ultimately a question of fact which can be determined only after a factual inquiry into the commercial realities faced by consumers").

## II.    The Second Amended Complaint Satisfies *Siva* And Plausibly Alleges MOC Is A Substitute For Other CME Products.

The District Court dismissed the initial Complaint herein, applying a post-tie analysis to conclude as a matter of law that certifications and MOC are not separate and distinct, but are instead "just one [product]—ABPN certification." Dkt. 60, at 8. Subsequently, however, this Court in *Siva*, relying on *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429 (7th Cir. 2020), held that when considering separate products, only the pre-tie stage matters: "Doing otherwise by looking at market demand in the post-tie world runs the risk of 'immuniz[ing] the worst-case scenario of a successful tie by which a monopolist successfully leverages a monopoly

19

in the tying product into a monopoly in the tied product.' Areeda &
Hovenkamp ¶ 1745d1." *Siva*, 38 F.4th at 575. [6]

Despite rejecting the post-tie analysis applied by the *Siva* district
court (and by the District Court here in dismissing the initial
Complaint), this Court nonetheless affirmed, finding the *Siva* plaintiff
had failed to "plead facts making it plausible that MOC is a substitute
for other [CME] products. *See Reifert v. South Central Wisconsin MLS
Corp.,* 450 F.3d 312, 318 (7th Cir. 2006) ("Products and services are in
the same market when they are good substitutes for one another.")."
*Siva*, 38 F.4th at 578. This, despite the fact the *Siva* district court had
"not quibble[d]" with plaintiff's allegations that "MOC is a kind of

---

[6]    *Siva* went on to criticize the district court there, finding it may
have improperly assumed a fact-finding role:

> "[I]n crediting the Board's characterization of its product
> over the well-pleaded and contrary allegations in Siva's
> complaint, the district court also 'may have drifted beyond
> reviewing the legal sufficiency of [Siva's] allegations into
> a fact-finding role.' *Zimmerman v. Bornick*, 25 F.4th 491,
> 493 (7th Cir. 2022)."

*Siva*, 38 F.4th at 577-78. As discussed herein, the District Court below
"drifted" beyond reviewing the legal sufficiency of the SAC into a fact-finding
role by holding MOC was a "poor" and "implausible" substitute for other
CME products despite Plaintiffs' well-pleaded allegations to the contrary.

[CME] product," *Siva*, 38 F.4th at 574, and even though the issue had not been briefed.[7]

Because the plaintiff in *Siva* had not specifically alleged that MOC contained "educational content" or that doctors "could earn CME credits" from MOC, and since MOC as alleged there "simply impose[d] a redundant obligation" to buy other CME products, this Court found it had not been plausibly alleged that MOC was a CME product. *Id*. 579-580. As explained below, however, the SAC fully addresses each of these shortcomings of the *Siva* complaint, and *Siva* supports reversal of the District Court's dismissal of the SAC.

A.     MOC Contains Educational Content.

As described by ABPN, MOC provides "lifelong learning through continuing medical education and other educational programs." (¶ 7). ABPN by waiving the purchase of CME products from other providers, and substituting its own assessment products (the Article Pathway and the Exam Pathway) for Category 1 credits sold by others, exchanges the

---

[7]     Both the initial Complaint and the FAC in this case were filed before this Court's ruling in *Siva*. Thus, the SAC (at issue here) was Plaintiffs' first opportunity to address *Siva's* call for more detailed allegations showing that MOC is a substitute for other CME products.

educational content of its products for the educational content of other CME products sold by other CME vendors. (¶ 105). Doctors view MOC as reasonably interchangeable with other CME products (¶¶ 122, 199(a)), recognizing MOC's educational content and that it serves the same educational purpose. The ACCME collaborates with ABMS Member Boards "to facilitate the integration of CME and MOC." (¶ 31).

The District Court mischaracterized MOC, finding that it consists "primarily" of an obligation to purchase content from third parties and is "primarily a requirement that participants [ ] obtain educational content rather than a vehicle for providing that content" A. 15,18. These are, however, improper and inaccurate factual findings. The MOC assessment component is clearly a "vehicle" for providing educational content, that can be satisfied only by ABPN's own assessment products, and is no less a primary "obligation" of MOC than the Activity Requirements. (¶¶ 101-103). That doctors "must" comply with the Assessment component to keep their certifications, confirms it is a primary obligation of MOC. (¶ 101).  In fact, the Activity Requirements and Assessment components are inextricably linked by ABPN's substitution of its own assessment products for Category 1 credits

required by MOC's Activity Requirements and sold by other CME suppliers. (¶ 105). It is simply wrong to say that either MOC component enjoys primacy over the other.

Indeed, the assessment component and required ABPN assessment products are the *sine qua non* of MOC. As ABPN has explained, MOC is a response to ABPN's concern that "many players" (other CME providers) had entered "the arena of assessment" (with their own CME products) and that ABPN "will continue to be challenged from the outside" (by other CME providers). (¶ 92). ABPN surely sees MOC and its assessment products as being in competition with the educational content of other CME products.

Perhaps the best indicators of MOC's educational content, however, are that ABPN's assessment products earn direct CME Category 1 credits from the AMA, and that many states accept either participating in MOC or passing a MOC examination, in full or partial satisfaction of CME requirements, as discussed immediately below.

B.     Doctors Use MOC To Meet State CME Licensure Requirements.

*Siva* found the complaint there lacked allegations showing that doctors "looking to fulfill [their] state CME obligations" could use MOC

to do so. *Siva*, 38 F.4th at 579-80. The SAC here alleges that like other CME products, MOC provides CME credits for state licensure, doing so in two different ways. First, directly through the AMA. (¶¶ 82, 101, 120, 199(e)). And second, by states accepting MOC in place of CME requirements. (¶¶ 119, 121, 199(g)). The two methods are independent of each other and will be addressed separately.

      1.    Doctors Earn Category 1 Credits From ABPN's Assessment Products.

Diplomates earn CME Category 1 credits toward state licensure for ABPN's assessment products directly from the AMA. (¶¶ 82, 101, 120, 199(e)). These direct credits can be applied by doctors toward state CME requirements nationwide. (¶¶ 82, 120, 177 (Dr. Akhter), 199(e)). Consistent with these allegations, Dr. Akhter earned "60 additional hours of Category 1 credits" from ABPN's Exam Pathway, and "used these additional credits to meet State licensure requirements instead of buying different CME products from other CME vendors." (¶ 177). These are not labels or conclusions, but factual allegations that direct credit from ABPN's assessment products is used by doctors as a substitute for other CME products to satisfy state CME requirements. Rather than

take these allegations as true, however, the District Court chose to dispute them. None of its assertions, however, withstand scrutiny.

First, without explaining the significance, it complained about a so-called "absent allegation" that direct credit from ABPN's assessment products "can be used to satisfy MOC's *own* Activity Requirements." A-12 (emphasis in original). The District Court then made the improper factual finding that without such an allegation, "MOC is clearly a poor substitute for other accredited CME products." *Id*. An allegation that direct credits from MOC's assessment products can be used to *satisfy MOC Activity Requirements*, however, would have nothing to do with how MOC is used *to satisfy state CME requirements*, which, because demand for CME products is "driven largely by state licensing requirements," is the appropriate inquiry. *See Siva*, 38 F.4th at 579.

Removing this irrelevant "absent allegation" from the District Court's equation compels the conclusion, consistent with *Siva*, that MOC is not a "poor substitute" but a reasonable substitute for other CME products. In *Siva*, this Court instructed that allegations of substitutability need only "permit an inference" of "cross-price elasticity between MOC and other [CME] offerings ... in plainer English, the two

products must be 'reasonably interchangeab[le]' in the minds of relevant consumers." 38 F.4th at 578 (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 325, 82 S. Ct. 1502, 8 L. Ed. 510 (1962)).

Here, the relevant consumers (doctors, including Dr. Akhter) view MOC as reasonably interchangeable with other CME products, recognizing they serve the same purpose and are commercial substitutes. (¶¶ 122, 177, 199(a)). Absolute interchangeability or fungibility is not required. *3M Co. v. Prybil*, 259 F.3d 587, 603 (7th Cir. 2001) (product need not be "perfect substitute" to be in same product market); *Gorlick Distribution Ctrs., LLC v. Car Sound Exhaust Sys.*, 723 F.3d 1019, 1025 (9th Cir. 2013) ("It doesn't matter whether Car Sound's products are fully interchangeable with those of its competitors because perfect fungibility isn't required."); *Allen-Myland, Inc. v. Intl. Business Machines Corp.*, 33 F.3d 194, 206 (3rd Cir. 1994) (interchangeability implies only "that one product is roughly equivalent to another for the use to which it is put").

The District Court also made an improper factual finding that "diplomates must do the extra legwork of applying for credit from the AMA." (A-12). The finding that obtaining direct credit is burdensome in some way, is made out of whole cloth. In fact, the evidence would show

26

that only the submission of a simple form is required. Second, to assert that "extra legwork" makes MOC a "poor substitute" ignores that doctors buying other CME products must do the "extra legwork" of evaluating available CME options, selecting the individual CME products, and submitting the necessary paperwork and payment to enroll and buy the selected products. If anything, the "extra legwork" for other CME products is likely more burdensome. At minimum, however, whether there is any meaningful "extra legwork" required for direct credit, whether it is greater than the "extra legwork" for other CME products, and whether any such discrepancy might mean MOC is not a reasonable substitute are all fact questions that cannot properly be decided on a motion to dismiss.

The District Court then discounted entirely the allegations of Dr. Akhter in particular. It criticized first that, "the complaint gives no indication of whether he earned direct credit by *studying* for the Recertification Examination, or from *taking* the exam itself." A-11 (emphasis in original). In fact, it was neither. Rather, the allegation is clear that Dr. Akhter earned the 60 credits "[a]fter *passing* the ten-year MOC examination." (¶ 177; emphasis added). Thus, the District Court's

finding of "a lack of clarity" regarding this factual allegation showing the use of direct credit toward state CME requirements, resulted from the District Court ignoring the allegation altogether. A-11.

Next, the District Court observed that ABPN's Exam Pathway operates on a ten-year cycle, obligating Dr. Akhter to take the exam just once every ten years, and that the 60 credits earned are not enough over that ten-year period "to maintain his certification." A-12-13. But how Dr. Akhter might "maintain his certification" with ABPN is not relevant to MOC's use to satisfy state CME requirements. What is relevant is that Dr. Akhter used the credits earned from ABPN's assessment product to meet CME requirements in states where he is licensed. (¶ 177). This restricted competition for CME products because Dr. Akhter did not need to buy CME products for those 60 credits from other CME providers for licensure.

Third, even assuming it intended to say "maintain his licensure," the District Court seems to believe MOC is a "poor substitute" because "[i]n the long run" the credits earned from ABPN's assessment products cannot satisfy in full a diplomate's state CME requirements. A-13. But that is nowhere alleged in the SAC, nor need it be. No individual CME

Category 1 product alone that Plaintiffs are aware of satisfies state requirements in full.  But even if such a product existed, the fact that the 60 additional credits from the Exam Pathway are fewer credits than needed to satisfy Dr. Akhter's licensure requirements in full over a ten-year period does not prevent those credits from being applied toward state CME requirements. Indeed, Dr. Akhter did just that and used the additional credits from ABPN's assessment product to meet state licensure requirements instead of buying other CME products from other CME providers. [8]

The District Court also held that despite Dr. Akhter's actual use of direct credits to satisfy state CME requirements, MOC was nonetheless "an implausible substitute" because it poses no risk of "completely" foreclosing competition in the market for CME products. A-14. Not only is the holding that MOC is an "implausible substitute" an improper factual finding, it disregards Plaintiffs' factual allegations to the contrary that MOC is used as a substitute for other CME products.

---

[8]     The Article Pathway, another ABPN assessment product, operates on a three-year cycle (¶ 102), meaning that 60 credits could be earned every three years, providing 200 additional Category 1 credits over ten years (20 per year on average) that can be used to satisfy state CME requirements.

The District Court also misstates the law. A risk that competition be "completely" foreclosed is not required. Rather, a risk that competition is "restrained" is sufficient. *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12, 104 S. Ct. 1551, 80 L. Ed. 2d 2 (1984). Consistent with *Jefferson Parish*, Plaintiffs allege that ABPN's illegal tie "threatens substantial foreclosure of competition" rather than complete or absolute foreclosure. (¶ 217). *See also Siva*, 38 F.4th at 579 (referring only to "risk of foreclosing competition" and not complete foreclosure); *Reifert*, 450 F. 3rd at 315 ("To support an antitrust action, a plaintiff must demonstrate that the defendant's actions have restrained competition."). Here, competition is restrained because doctors using direct credit from ABPN's assessment products for licensure do not need to buy additional CME products from other CME providers.

The bottom line, according to the District Court was that '[n]o psychiatrist looking to earn sixty hours of Category 1 CME credit would choose MOC over other accredited CME products." A-12. Yet that is exactly what Dr. Akhter did, as the SAC clearly alleges:

> "After passing the ten-year MOC examination Dr. Akhter applied for "direct credit" from the AMA for CME Category 1 credits and was given 60 additional hours of Category 1 credits over and above the credits he had already earned

> from his purchases of CME as part of his MOC "Activity Requirements." Dr. Akhter used these additional credits to meet State licensure requirements instead of buying different CME products from other CME vendor*s.*"

(¶ 177). This, of course, makes complete sense as Dr. Akhter used the Exam Pathway to satisfy both MOC's Assessment component and state licensure requirements, rather than buying another 60 credits for licensure from other CME providers.

The District Court, however, refused to take these allegations as true. Instead, it felt it was "preclud[ed]" from making an "inference" that Dr. Akhter had, in truth and as alleged, used the 60 credits to meet state CME requirements, citing a lack of specific evidentiary "detail" in the SAC showing that CME requirements in states in which Dr. Akhter is licensed are higher than the credits from ABPN's Activity Requirements. A-13. But no inference was necessary, due to the factual allegations that Dr. Akhter **had** "used the[ ] additional the credits to meet State licensure requirements." (¶ 177; emphasis added). For whatever reason, the District Court gave no meaningful heed to these allegations.

If the District Court believed an inference were required, however, it was by no means precluded from making one. It was able to and should have made the reasonable and favorable inference, consistent with

Dr. Akhter's well-pleaded factual allegations, that CME requirements **are** higher in states where he is licensed. *See Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1329 n.5 (Fed. Cir. 2009) (reasonable inference is one that is "plausible" and that "flows logically" from the facts alleged); *Poppell v. City of San Diego*, 149 F.3d 951, 954 (9th Cir. 1998) (permissible inference exists when "there is a reasonable probability that the conclusion flows from the proven facts."). *See also* Black's Law Dictionary (10th ed. 2014) (inference defined as "[a] conclusion reached by considering other facts and deducing a logical consequence from them.").

In fact, Dr. Akhter is licensed in Hawaii and Massachusetts (¶ 172), and meets state CME requirements in both those states by completing 100 Category 1 credits *every two years* (50 per year on average). *Haw. Admin. R.* § 16-85-33(3); 243 *Code Mass. Reg.* 2.06(6)(a). This is more than the 90 Category 1 credits over three years (30 per year on average) from ABPN's Activity Requirements, leaving another 20 credits per year on average needed for state licensure. Dr. Akhter's additional 60 Category 1 credits earned from ABPN's Exam Pathway (20 per year on average) are over and above the 90 credits from ABPN's

Activity Requirements, and were used by Dr. Akhter to satisfy the additional 20 credits needed for state licensure. (¶ 177). This restricted competition because Dr. Akhter did not need to buy other CME products from other CME providers for licensure in Hawaii and Massachusetts.

The District Court appears to believe, without any cited authority, that MOC is a reasonable substitute for other CME products only if a state's CME requirement is higher than the 90 credits earned from ABPN's Activity Requirements (30 per year on average). While as shown herein that is the case for many states (including states in which Dr. Lazarou and Dr. Akhter are licensed), Plaintiffs do not concede the District Court's confined approach to substitutability.

Doctors earn direct CME Category 1 credits from ABPN's required assessment products regardless of individual state CME requirements. In other words, the fact that a state might have a CME requirement lower than the credits from ABPN's Activity Requirements does not void the direct credit. Once the direct credit is earned it is up to the doctor to apply it toward licensure to whatever state or states for whatever licensure cycles he or she believes most beneficial. The same is true for state acceptance of MOC, discussed immediately below. No state

qualifies its acceptance on whether its CME requirement happens to be higher or lower than the credits from ABPN's Activity Requirements. Direct credit from the AMA and state acceptance of MOC is persuasive evidence that MOC is a substitute for other CME products, even though some state CME requirements are lower than the credits from ABPN's Activity Requirements.

        2.      States Accept MOC In Place Of Their CME Requirements.

As just described above, direct credit from ABPN assessment products can be applied by doctors toward state CME requirements nationwide. A second way MOC serves as a substitute for other CME products is that many states accept either participating in MOC or passing a MOC examination, in full or partial satisfaction of CME requirements, without the need of even obtaining Category 1 credit status. (¶¶ 119, 121). Not all states currently accept MOC in these ways, but as alleged in the SAC many do.

Participating in MOC is accepted in lieu of CME requirements altogether in several states, while other states accept a MOC examination as a substitute for some or all CME requirements. (¶¶ 119, 121, 199(g)). These are factual allegations, not labels or conclusions. The

District Court nonetheless chose to dispute them rather than accept them as true as it was bound to do. But once again, its assertions fail to withstand scrutiny.

The District Court first found fault with the SAC's lack of an allegation that, "any state *requires* MOC to maintain licensure." A-15 (emphasis in original). The fact that states accept MOC in place of CME requirements shows it is a substitute for other CME products, regardless of whether states may require MOC. In other words, MOC can be substitute without being required. [9]

The District Court next observed there is no allegation in the SAC that ABPN limits the Category 1 credits diplomates "can choose to satisfy ABPN's Activity Requirements." *Id*. While true, no such allegation is needed to sustain Plaintiffs' tying claims. Whether ABPN places any limits or restrictions on the Category 1 credits used to meet MOC's Activity Requirements (which Plaintiffs do not allege) is simply not relevant to state acceptance of MOC.

---

[9]    There is nothing in the record to suggest that any state requires any particular CME product from any other CME provider. Thus, MOC is no different from other CME products in this regard.

The District Court also mistakenly found that the "only" states that accept MOC in full satisfaction of CME requirements are Idaho, Minnesota, Oregon, New Hampshire, and West Virginia, and that only California, Kentucky, and Michigan accept passing a MOC examination in place of some or all CME requirements. A-16. But those states are explicitly alleged to be just "[e]xamples" and not a complete list. (¶¶ 119, 121). In fact, at least 26 states currently accept either participating in MOC or passing a MOC examination, in full or partial satisfaction of CME requirements. *See* Exhibit A hereto.

Thus, doctors in New Hampshire, "[f]or example" (¶ 119), meet the CME requirement by completing 100 Category 1 credits every two years (50 per year on average). 1 *N.H. Code Admin. Med.* 402.01(a*)*. This is higher than the 90 credits (30 per year on average) from ABPN Activity Requirements. MOC is accepted by New Hampshire, however, in full satisfaction of the higher CME requirement. 1 *N.H. Code Admin. Med.* 402.01(i) (doctors "up to date on a program of maintenance of certification [MOC] … shall be considered to have completed their continuing medical education requirement for the preceding 2 years."). This restricts competition for CME products as doctors do not need to

buy additional CME products from other CME providers for licensure in New Hampshire.

Washington, identified in the SAC (¶ 120), is to the same effect. It also accepts MOC in full satisfaction of the higher CME credits it otherwise requires (50 per year on average) compared to those from ABPN's Activity Requirements (30 per year on average). *WAC* 249-919-430(4) (doctors satisfy licensure requirements by "[m]eet[ing] the requirements for participation in maintenance of certification [MOC] of a member board of the American Board of Medical Specialties at the time of renewal."). Washington, thus, also allows doctors to maintain licensure without purchasing additional CME products from other CME vendors. [10]

As an "example" of partial satisfaction of CME requirements by taking a MOC examination, doctors in Michigan (¶ 121) meet the CME

---

[10] Pennsylvania, while not included as an "example" in the SAC, like New Hampshire and Washington also accepts MOC in full satisfaction of the higher CME credits it otherwise requires (50 per year on average) compared to those from ABPN's Activity Requirements (30 per year on average). 49 Pa. Code §§ 16.19(b), 16.19(b)(2)(i)(c) (100 hours of CME Category 1 requirement satisfied by "specialty certification by a member organization of the American Board of Medical Specialties").

requirement by completing 150 Category 1 credits every three years (50 per year on average). *Mich. Admin. Rules* 338.2441(2). This is higher than the 90 credits (30 per year on average) from the ABPN Activity Requirements. Michigan, however, grants doctors 50 credits for passing a recertification examination during the three-year licensure cycle. *Mich. Admin. Rules* 338.2443(2)(b). While the granting of 50 additional credits, even with credits from ABPN's Activity Requirements, still falls short of Michigan's CME requirement by 3 credits (rounded) on average per year, ABPN's Exam Pathway is, nonetheless and as alleged, "a substitute for some or all" of the CME requirement. (¶ 121). As with New Hampshire and Washington, this restricts the competition for CME products as these credits replace CME products from other CME providers for licensure. [11]

The District Court criticized the SAC for its lack of this type of specific evidentiary "detail" showing that CME requirements for individual states accepting MOC are higher than the credits from

---

[11]    Because the Interstate Compact allows a doctor licensed in one state to then become licensed in other member states (¶¶ 123-124), state acceptance of MOC by the states identified in the SAC and by the full panoply of states on Exhibit A, means that all Interstate Compact member states accept MOC. *See infra* pp. 49-50.

ABPN's Activity Requirements. A-15-16. Without that evidentiary detail, the District Court claimed it was "preclud[ed]" from the "inference" that states accepting MOC had higher CME requirements and that "the acceptance of MOC harms competition." A-16. But no inference was necessary in light of Plaintiffs' factual allegations that states **do** accept either participating in MOC or passing a MOC examination, in full or partial satisfaction of CME requirements. (¶¶ 119, 121). Had the District Court accepted these well-pleaded factual allegations as true, as it should have, there would have been no need for it to make any inference, or for the additional evidentiary detail it found lacking. [12]

If the District Court nonetheless believed an inference were required, there was nothing to prevent it from making one. The District Court was able to and should have made the reasonable and favorable inference, consistent with Plaintiffs' allegations, that CME requirements **are** higher in at least some states that accept MOC, demonstrating that

---

[12]    As already noted, *supra* p. 18, allegations of such detailed "evidence … at the pleading stage" is not required. *Carlson*, 758 F.3d at 827; *SD3, LLC*, 801 F.3d at 431 (no "requirement" that "an antitrust plaintiff [ ] plead evidence").

state acceptance of MOC shows it to be a substitute for other CME products that harms competition. *See* authorities cited *supra* pp. 31-32.

Because ABPN did not question Plaintiffs' allegations about state acceptance of MOC in its Motion to Dismiss papers (Dkt. 98, 99, 106), Plaintiffs did not address individual state CME requirements in their Response. (Dkt. 104).[13] Had the allegations been challenged, Plaintiffs would have elaborated on them by providing the detail set forth above that the District Court later found wanting. *See Heng v. Heavner, Beyers & Mihlar, LLC*, 849 F.3d 348, 354 (7th Cir. 2017) (courts may consider elaborations of allegations in a plaintiff's response brief in deciding a motion to dismiss so long as they are "consistent with the pleadings."). In addition, the SAC identified specific states that accept MOC whose

---

[13]     In its Reply in support of the motion to dismiss, ABPN did not dispute the allegations that "some States accept a doctor's buying MOC in lieu of compliance with CME requirements for licensure altogether." (¶ 119). Rather, ABPN claimed only that the "portrayal" of Idaho in the SAC is inaccurate because Idaho accepts MOC only "during the [licensure] cycle in which the … recertification is granted." (Dkt. 106, p. 4 n. 3). But since MOC is a continuous ABPN requirement (or else doctors lose their certifications), recertification, by definition, occurs in every licensure cycle. In other words, so long as Idaho doctors participate in MOC, their CME requirements are deemed satisfied in full. ABPN raised no challenge regarding any other state alleged by Plaintiffs to accept MOC.

CME requirements are higher than those necessary to meet ABPN's Activity Requirements (discussed above), and the District Court could have taken judicial notice of the publicly available licensure statutes and regulations of those states. *See Newcomb v. Brennan*, 558 F.2d 825, 829 (7th Cir. 1977) ("matters of public record such as state statutes, city charters, and city ordinances … are therefore proper subjects for judicial notice")

This Court may also consider as part of its *de novo* review Plaintiffs' elaborations concerning individual state CME requirements. *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012) ("A party appealing a Rule 12(b)(6) dismissal may elaborate on his factual allegations so long as the new elaborations are consistent with the pleadings.") (citing *Highsmith v. Chrysler Credit Corp.*, 18 F.3d 434, 439-40 (7th Cir. 1994) (reversal of dismissal based in part on new elaborations)); *St. Anthony Hosp. v. Whitehorn*, 100 F.4th 767, 776 n.2 (7th Cir. 2024) (information submitted by plaintiff "elaborates on and illustrates factual allegations in the complaint."). This Court may also take judicial notice of the publicly available licensure statutes and regulations of the states cited above, as well as in Exhibit A. *United States v. McCormick*, 309 F.2d 367,

371 (7th Cir. 1962) (judicial notice of Maryland law). *See also* Fed. R. Evid. 201(d) (judicial notice may be taken "at any stage of the proceeding").

    C.    MOC Does Not Impose A Redundant Obligation.

Importantly, consideration of redundancy is very different here than in *Siva*, where neither direct credit nor state acceptance of MOC was alleged. The District Court, nonetheless, made the improper factual finding that ABPN's Activity Requirements component "appears" to impose a "redundant obligation." A-10. As the District Court saw it:

> "'No psychiatrist looking to earn sixty hours of Category 1 CME credit would choose MOC over other accredited CME products because—even if the diplomate successfully obtained sixty hours of direct credit from the AMA—MOC would impose an additional obligation to obtain *ninety* CME credits from other providers … On such facts, MOC would be simply creating a redundant (and excessive) obligation to obtain CME products."

A. 12-13. This is counter-intuitive on its face, as it makes no sense for the AMA even to bother with direct credit if it is redundant and, thus, serves no purpose. [14]

---

[14]    The District Court focused on ABPN's Activity Requirements and direct credit, and did not claim redundancy with regard to state acceptance of MOC. *See* A.-10, 12-13.

Several of the states identified in the SAC (though not all) have CME requirements higher than those needed to satisfy ABPN's Activity Requirements, thus pretermitting redundancy. Doctors in Illinois (where Dr. Lazarou is licensed) and Michigan meet state CME requirements by completing 150 Category 1 credits every three years (50 credits per year on average). *Ill. Admin. Code* Title 68, § 1285.110(a); *Mich. Admin. Rules* 338.2441(2). Doctors in New Hampshire meet state CME requirements by completing 100 Category 1 credits every two years (also 50 per year on average). 1 *N.H. Code Admin. Med.* 402.01(a*).* And doctors in Washington meet CME requirements by completing 200 Category 1 credits every four years (also 50 per year on average). *WAC* 246-919-430(1), 246-919-460(1). The CME requirements of all of these states, like Hawaii and Massachusetts in which Dr. Akhter is licensed, exceed the credits from meeting ABPN's Activity Requirements.

Thus, doctors in all of these states can, without any redundancy, and like Dr. Akhter, use direct credit from ABPN's assessment products to satisfy state CME requirements. Doctors using the ABPN Exam Pathway receive 20 additional non-redundant Category 1 credits on average per year for three years during the ten-year Exam Pathway

cycle. Those using the ABPN Article Pathway can receive 20 additional non-redundant credits on average per year for all three years in the three-year Article Pathway cycle. This restricts competition for CME products because doctors can use the non-redundant direct credit from ABPN's required assessment products rather than buy other CME products from other CME providers for licensure. Contrary to the District Court's improper factual finding, there is no disabling redundancy inherent in MOC. [15]

Once again, however, the District Court criticized the lack of this type of specific evidentiary "detail" in the SAC showing that individual state CME requirements are higher than the credits from ABPN's Activity Requirements. A. 13. It held that without such evidentiary detail it could not "infer" that state CME requirements are higher, and

---

[15]    Other jurisdictions not included as an "example" in the SAC also have CME requirements higher than the credits from ABPN's Activity Requirements, thereby foreclosing any redundancy. Doctors in New Jersey, Pennsylvania, and Guam also meet state CME licensure requirements by completing 100 Category 1 credits *every two years* (50 per year on average). *N.J. Admin. Code* 13:35-6.15; 49 *Pa. Code* § 16.19(b); 25 *GAR Prof. & Voc. Regs.* § 11101(g)(9). And a different licensure cycle in Kansas, *every 30 months*, also results in CME requirements greater than the 90 credits needed to satisfy ABPN's Activity Requirements. *Kan. Admin. Reg.* § 100-15-5(B).

found as a result that MOC "appears" redundant in the use of direct credits. *Id*. But again, no inference was necessary. Plaintiffs allege that credits from ABPN's assessment products **are** used to meet state CME requirements and that Dr. Akhter in particular **had** used them in exactly that way without any redundancy. (¶¶ 82, 101, 120, 177, 199(e)). If the District Court had accepted these well-pleaded factual allegations as true, as it should have, there would have been no need for it to make any inference, or for the additional evidentiary detail it found lacking.

At a minimum, even assuming an inference were necessary, the District Court was not prevented from making it. Rather, it was able to and should have made the reasonable and favorable inference, consistent with Plaintiffs' allegations, that state CME requirements **are** higher in at least some states, precluding its finding that MOC "appears" redundant. *See* authorities cited *supra* pp. 31-32.

Because ABPN in its Motion to Dismiss papers did not question state CME requirements generally or challenge Dr. Akhter's use of direct credits to meet state licensure requirements in particular (Dkt. 98, 99, 106), Plaintiffs did not address individual state CME requirements in their Response (Dkt. 104). Had the allegations been challenged, Plaintiffs

would have elaborated on them by providing the evidentiary detail set forth above that the District Court later found wanting. *See Heng*, 849 F.3d at 354 (courts may consider elaborations in deciding a motion to dismiss that are "consistent with the pleadings"). In addition, specific states are identified in the SAC whose CME requirements are higher than those necessary to meet ABPN's Activity Requirements (discussed above), including states in which Dr. Akhter is licensed, and the District Court could have taken judicial notice of the publicly available licensure statutes and regulations of those states.

As discussed above, *supra* pp. 41-42, because this is a *de novo* review, this Court may consider Plaintiffs' elaborations concerning individual state CME requirements, and can also take judicial notice of publicly available licensure statutes and regulations.

## III.   Plaintiffs Have Antitrust Standing.

The District Court questioned Plaintiffs' antitrust standing because neither of them is licensed in a state identified in the SAC as accepting MOC. A.-16-17.  As already noted, however, those states are identified only as "examples." (¶¶ 119, 121). Dr. Lazarou is licensed in Texas (¶ 157) and Dr. Akhter in Massachusetts (¶ 172), which both

accept either participating in MOC or passing a MOC examination, in full or partial satisfaction of CME requirements. *See* Exhibit A hereto.

The District Court also ignored the use of direct credit earned from ABPN's assessment products in its consideration of antitrust standing. Dr. Akhter is licensed in Massachusetts (¶ 172), identified in the SAC as an example of a state in which direct credits from ABPN's assessment products can be used toward CME requirements. (¶ 120). And because direct credits can be used nationwide, Dr. Akhter also used them in Hawaii, where he is also licensed (¶ 172), and Dr. Lazarou could use them in Illinois, where she is licensed (¶157). How Dr. Akhter used direct credit to satisfy the CME requirements of Hawaii and Massachusetts is discussed above, *supra* pp. 32-33.

As for Dr. Lazarou, the District Court noted that the Illinois "baseline [CME] requirement" is only 60 credits compared to the 90 credits from ABPN's Activity Requirements, leaving the District Court without a "plausible explanation" why an Illinois doctor like Dr. Lazarou would substitute the 60 credits from ABPN's assessment products for other CME products. A.-17.

The explanation, though, flows not from Illinois' "baseline requirement," but from the total Illinois CME requirement of 150 credits every three years (50 per year on average). *See supra* p. 4. This is more than the 90 Category 1 credits over three years (30 per year on average) from ABPN's Activity Requirements, leaving another 20 credits per year on average needed for licensure. The additional 60 credits earned from ABPN's assessment products (20 per year on average) can be used by any Illinois-licensed doctor, including Dr. Lazarou, to satisfy the additional 20 credits needed. This restrains the competition for CME products as those credits replace other CME products from other CME providers.

Relatedly, the District Court also questioned Plaintiffs' allegation that the market for CME products is nationwide. A.-17 n. 3. First, allegations of a nationwide market are not "conclusory" as the District Court believed, they are factual allegations that can at the appropriate time be admitted or denied, but must be accepted as true on a Rule 12(b)(6) motion to dismiss.

Second, inquiry into the relevant product market, including its geographic contours, presents myriad and substantial factual issues

requiring development of a full evidentiary record, including expert analysis and testimony, that should not be decided as a matter of law at the pleading stage. *See Eastman Kodak Co.,* 504 U.S. at 469 ("the proper market definition ... can be determined only after a factual inquiry into the commercial realities faced by consumers"); *E.I. DuPont de Nemours v. Kolon Indus.*, 637 F.3d 435, 443, 447 (4th Cir. 2011) (reversing dismissal where district court found geographic scope not properly pleaded, "Because market definition is a deeply fact-intensive inquiry," and "Whether Kolon's proffered relevant geographic market definition will hold up upon a fact-intensive inquiry remains to be seen. But dismissing Kolon's Counterclaim on its face was error."); *Todd v. Exxon Corp.*, 275 F.3d 191, 199-200 (2nd Cir. 2001) ("Because market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant product market.").

Third, the SAC contains allegations supporting a nationwide market, even assuming such evidentiary detail is required. It has not been disputed that MOC and other CME products are bought and sold nationwide. (*See* ¶¶ 5, 75). And certainly, the nationwide use of direct credit toward state CME requirements supports a nationwide market.

State acceptance of MOC also supports a nationwide market through use of the Interstate Compact, available to doctors in almost all states. (¶¶ 123-124).

For example, a doctor licensed in New Hampshire, which accepts MOC in full satisfaction of its higher CME requirements, can obtain licensure in all of the other states in the Interstate Compact, including states whose own CME requirements are also higher, and regardless of whether and how the other states accept MOC. As of the filing of the SAC, 35 states had joined the Compact, and legislation to join the Compact was pending in eight other states. (¶ 124).

The District Court discounted the Interstate Compact, because it felt "there are insufficient facts upon which to conclude that the acceptance of MOC restricts competition for CME products in other states." A.-18. It was not the District Court's role, however, to serve as factfinder or "conclude" anything. And in any event, as discussed throughout above, use of direct credit nationwide and state acceptance of MOC both restrict competition for CME products. *E.g.*, *supra* pp. 14, 30, 36, 38, 44, 48. Thus, it is no surprise that the number of CME providers

has declined by nearly forty percent since ABPN and other ABMS Member Boards began selling MOC. (¶ 217).

## IV. Upon Reinstatement of the Sherman Act Claims, Plaintiffs' Unjust Enrichment Claim Also Should Be Reinstated.

After dismissing the Sherman Act claims, the only federal claims alleged, the District Court declined to exercise supplemental jurisdiction over Plaintiffs' claim for unjust enrichment. A-20. Upon reinstatement of the Sherman Act claims, the unjust enrichment claim should be reinstated as well.

## V. Because The SAC Was The First Opportunity To Address *Siva*, If This Court Decides Specific Evidentiary Details About Individual State CME Requirements Should Have Been Pleaded, Plaintiffs Request Leave To Amend To Do So.

Once the shortcomings in its other rationale for dismissal are exposed, as above, even the District Court concedes it could "imagine circumstances" in the context of direct credit and also "imagine a scenario" in the context of state acceptance, that would support Plaintiffs' tying claims. A. 14, 15. In *both* instances, however, it found Plaintiffs' claims had not been plausibly alleged for the reason that the SAC lacked specific evidentiary detail about whether state CME requirements are higher than the credits from ABPN's Activity

51

Requirements. As set out above, several states identified in the SAC, including states in which Plaintiffs are licensed, as well as additional states identified herein, do have higher CME requirements, as confirmed by publicly available statutes and regulations.

The initial Complaint in this case was filed on March 16, 2019 (Dkt. 1), before *Viamedia* was decided on February 24, 2020. The initial Complaint was dismissed because the District Court found, based on a post-tie analysis, that certifications and MOC were a single product (Dkt. 60), an approach later found to have been erroneous in *Viamedia*. The FAC was filed on November 23, 2020, before *Siva* was decided on June 28, 2022. Thus, the SAC was Plaintiffs' first opportunity to address this Court's call for more detailed allegations showing that MOC is a substitute for other CME products.

Leave to amend should be "freely" granted "when justice so requires." *Glover v. Carr*, 949 F.3d 364, 367 (7th Cir. 2020) (quoting Fed. R. Civ. P. 15(a)(2)). The denial of leave to amend is reviewed by this Court for abuse of discretion. *Id.* at 368. There is nothing in the record to support, and the District Court did not suggest, that Plaintiffs are guilty

of undue delay, bad faith, or dilatory motive, or that allowing leave to amend would be unduly prejudicial to ABPN.

While as the District Court noted prior amendments have been allowed, the SAC was the first opportunity Plaintiffs had to address *Siva*. Whether MOC was plausibly alleged to be a CME product was not raised by ABPN or the District Court below prior to *Siva*. Thus, allowing an amendment on that issue would be the second and not the fourth "bite of the apple." Further, far from being futile, permitting an amendment to add specific details about the individual state CME requirements discussed herein, would simply confirm that the "scenarios" the District Court recognized would support Plaintiffs' tying claims do, in fact, exist. Accordingly, if this Court decides specific evidentiary details about individual state CME requirements should have been included in the SAC, Plaintiffs respectfully request that they be given leave to amend to do so.

## CONCLUSION

For all of the foregoing reasons, Plaintiffs-Appellants respectfully ask this Court to reverse the District Court's dismissal of the Second

Amended Class Action Complaint. Alternatively, Plaintiffs-Appellants respectfully request they be given leave to amend.

Respectfully submitted

**Emily Elizabeth Lazarou, and Aafaque Akhter, individually and on behalf of all others similarly situated**

Dated:  August 30, 2024          By:  ___/s/ C. Philip Curley_____
One of Their Attorneys

C. Philip Curley
Robert L. Margolis
ROBINSON CURLEY, P.C.
600 West Van Buren Street, Suite 700
Chicago, Illinois 60607
Tel. 312.663.3100
pcurley@robinsoncurley.com
rmargolis@robinsoncurley.com
        *Attorneys for Plaintiffs-Appellants*

54

## CERTIFICATE OF COMPLIANCE WITH F.R.A.P. 32(a)(7)(B)

I, C. Philip Curley, counsel for Plaintiffs-Appellants, certifies that this brief complies with the type volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B). This brief was prepared in Century Schoolbook proportional font in Microsoft Word for Microsoft 365 MSO (Version 2408 Build 17928.20114) software and excluding the parts of the document exempted by Fed. R. App. P. 32(f) has 10,603 words, including footnotes, according to the Microsoft Word count.

Dated: August 30, 2024

/s/ C. Philip Curley
C. Philip Curley

## CERTIFICATE OF COMPLIANCE WITH CIRCUIT RULE 30

I, C. Philip Curley, counsel for Plaintiffs-Appellants, certifies that the Required Short Appendix and Separate Appendix of Plaintiffs-Appellants contain and include all materials required by Cir. R. 30(a) and (b) of the United States Court of Appeals for the Seventh Circuit.

Dated: August 30, 2024

/s/ C. Philip Curley
C. Philip Curley

## CERTIFICATE OF SERVICE

C. Philip Curley, counsel for Plaintiffs-Appellants, certifies that on August 30, 2024, he caused to be electronically filed with the Clerk of the United States Court of Appeals for the Seventh Circuit **Brief and Required Short Appendix of Plaintiffs-Appellants**, using the Court's CM/ECF system, which shall send notification of this filing to all counsel of record.

/s/ C. Philip Curley
C. Philip Curley

# EXHIBIT A

## STATES THAT ACCEPT EITHER PARTICIPATING IN MOC OR PASSING A MOC EXAMINATION, IN FULL OR PARTIAL SATISFACTION OF CME REQUIREMENTS

| STATE | RELEVANT PROVISION | CITATION |
|---|---|---|
| Alabama | Alabama Board of Medical Examiners webpage for "Continuing Medical Education Requirements for Licensees, FAQ for "What are 'equivalent' credits" to AMA Category 1 credits includes: "Successful completion of an ABMS board … [MOC] process …" | https://www.albme.gov/ resources /licensees/continuing- medical- education/licensure- cme-requirement |
| Alaska | "[R]ecertification during the concluding licensing period by specialty board recognized by the American Medical Association" is "equivalent" to the required CME hours. | Alaska Admin. Code § 40.210(2) |
| California | "Any physician who takes and passes a … recertifying examination administered by a recognized specialty board shall be granted credit for four (4) consecutive years (100 hours) of continuing education credit for relicensing purposes. Such credit may be applied retroactively or prospectively." | 16 Cal. Code Regs. §§ 1336(a), 1337(d) |
| Idaho | "The Board may accept … recertification by a member of the American Board of Medical Specialties … in lieu of compliance with continuing education requirements during the cycle in which the … recertification is granted." | Idaho Admin. Code R. 24.33.01-079.03 |
| Illinois | Doctors receive 60 CME hours for participating in "CME programs required for … recertification by specialty boards …" | Ill. Admin. Code. tit. 68, §§ 1285.110, 1285.110(b)(1)(A) and (b)(2)(B) |
| Iowa | "[P]articipation in … board … recertification by an ABMS … specialty board within the licensing period" is the "equivalent" to 50 hours of Category 1 credits. | Iowa Admin. Code R. 653-11.2(2); 653-11(4)(1) |

| STATE | RELEVANT PROVISION | CITATION |
|---|---|---|
| Kentucky | "Passing a … recertification examination of one of the specialty boards that are members of the American Board of Medical Specialties … will count for 60 hours of CME credit." | Kentucky Board of Medical Licensure FAQ page, https://kbml.ky.gov/cme /Pages/ default.aspx |
| Louisiana | Exception to CME requirement for doctor "who has within the past year been … recertified by a member board of the American Board of Medical Specialties …" | La. Admin. Code. tit. 46, pt. XLV, § 447.3 |
| Maine | "American Board of Medical Specialties (ABMS) specialty board … recertification within the 24 months preceding renewal" has a "value" of 25 CME credit hours. | Me. Code R. 02-373-1 § 11(1)(A) and 11(2)(A)(5) |
| Massachusetts | "Becoming … recertified by a specialty board accredited by the American Board of Medical Specialties … will be deemed the equivalent of 60 credits in Category 1, including four credits in Category 1 risk management." | Commonwealth of Massachusetts Board of Registration in Medicine, Policy 94-005 (Amended September 21, 2011) |
| Michigan | Doctors receive 50 CME Category 1 hours for "[t]aking and passing a specialty board certification or recertification examination for a specialty board recognized by the American Board of Medical Specialties." | Mich. Admin. Rule 338.2443(2)(b); Mich Admin. Rule 338.2441(2), 338.2443(1)(d) |
| Minnesota | "The Board may accept … recertification by a member of the American Board of Medical Specialties … in lieu of compliance with the continuing education requirements during the cycle in which … recertification is granted." | Minn. Admin. Rules 5605.0700 |
| Missouri | "A licensee who has obtained American Specialty Board … recertification during the reporting period shall be deemed to have obtained the required hours of continuing medical education." | Mo. Code. Regs. Ann. tit. 20, 2150-2.125(6) |

| STATE | RELEVANT PROVISION | CITATION |
|---|---|---|
| New Hampshire | "Licensees who show proof of being up to date on a program of maintenance of certification by the physician's specialty organization, deemed adequate by the board, shall be considered to have completed their continuing medical education requirement for the preceding 2 years." | N.H. Code Admin. Med. 402.01(i) |
| New Mexico | Accepting "recertification by an ABMS approved specialty board during the renewal period" "as fulfillment of CME requirements." | N.M. Admin. Code § 16.10.4.10(E) |
| North Carolina | "A physician who attests that he or she is engaged in a program of … maintenance of certification from an ABMS … specialty board shall be deemed his or her entire CME requirement for that three year cycle." | N.C. Admin. Code tit. 21, r. 32R.0103(c) |
| North Dakota | Excluding from CME hour requirements, "Physicians who hold a current certification, maintenance of certification, or recertification by a member of the American board of medical specialties …" | N.D. Admin. Code 50-04-01-02(5) |
| Oklahoma | "The Board shall accept as verification [of compliance with CME requirements] … Specialty board … recertification that was obtained during the three year reporting period, by an American Board of Medical Specialties (ABMS) specialty board." | Okla. Admin. Code § 435:10-15-1(B)(2)(B) |
| Oregon | "Ongoing participation in a program of … maintenance of certification by an American Board of Medical Specialties (ABMS) Board" is an alternative to the CME requirement. | Oregon Admin. R. 847-008-0070(1)(a),(b) |
| Pennsylvania | Category 1 requirement satisfied by "specialty certification by a member organization of the American Board of Medical Specialties." | 49 Pa. Code. § 16.19(b)(2)(i)(C) |

| STATE | RELEVANT PROVISION | CITATION |
|---|---|---|
| Rhode Island | "A physician's participation in an American Board of Medical Specialty's (ABMS) Maintenance of Certification program will be considered equivalent to meeting CME requirement." | R.I. Admin. Code tit. 216, Ch. 40, subch. 05, r. 1.5.5(A)(1) |
| South Carolina | "[R]ecertification after examination by a national specialty board recognized by the American Board of Medical Specialties" an "option" for license renewal. | S.C. Code § 40-47-40(2)(b) |
| Texas | "[A] physician shall be presumed to have complied with [CME requirements] if the physician is meeting the Maintenance of Certification (MOC) program requirements set forth by a specialty or subspecialty member board of the ABMS … and the member board's MOC … program mandates completion of CME credits that meet the minimum criteria set forth" in the Texas code. | Tx. Admin. Code tit. 22, Part 9, Rule § 166.2(d) |
| Washington | "Maintenance of licensure" requires either 200 CME hours every four years (all of which can be Category 1), or "meet[ing] the requirements for participation in maintenance of certification of a member board of the American Board of Medical Specialties at the time of renewal." | Wash. Admin. Code 246-919-430(1), (4) |
| West Virginia | "[S]uccessful involvement in maintenance of certification from [an] ABMS member board during the reporting period" is among the "[t]ypes and categories of continuing medical education satisfactory to the Board for physicians" to meet the CME requirement. | W. Va. C.S.R. § 11-6-3.1c |
| Wyoming | "A current certificate from a specialty board approved by the A.B.M.S. considered by the specialty board to be equivalent to the hours claimed to be attributable to such certificate by the licensee." | Wyoming Board of Medical Rules and Regulations, Ch. 3, § 7(a)(iv) |

No. 24-1994

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

---

**Emily Elizabeth Lazarou, and Aafaque
Akhter, individually and on behalf
of all others similarly situated**

$\qquad$ **Plaintiffs-Appellants,**

    **v.**

**American Board of Psychiatry
and Neurology,**

$\qquad$ **Defendant-Appellee.**

---

### Appeal from the United States District Court
### for the Northern District of Illinois, Eastern Division,
### Case No. 1:19-cv-01614
### The Honorable Judge Jeremy C. Daniel

---

## REQUIRED SHORT APPENDIX OF PLAINTIFFS-APPELLANTS

---

C. Philip Curley
Robert L. Margolis
ROBINSON CURLEY P.C.
300 South Wacker Drive, Suite 1700
Chicago, IL 60606
Tel: 312.663.3100
pcurley@robinsoncurley.com
rmargolis@robinsoncurley.com
    *Attorneys for Plaintiffs-Appellants*

Oral Argument Requested

Index to Required Short Appendix

Page

Judgment in Civil Case Terminating Case
(Docket No. 109) .................................................................... A-1

The Court's Memorandum Opinion and Order
(Docket No. 108) .................................................................... A-2

ILND 450 (Rev.4/29/2016) Judgment in a Civil Action
Case: 1:19-cv-01614 Document #: 109 Filed: 05/13/24 Page 1 of 1 PageID #:1338
Case: 24-1994    Document: 12    Filed: 08/30/2024    Pages: 93

# IN THE UNITED STATES DISTRICT COURT
## FOR THE
## NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| Emily Elizabeth Lazarou et al, | |
| Plaintiff(s), | |
| v. | Case No.  1:19-cv-01614 |
| | Judge Jeremy C. Daniel |
| American Board of Psychiatry and Neurology, | |
| Defendant(s). | |

## JUDGMENT IN A CIVIL CASE

Judgment is hereby entered (check appropriate box):

☐    in favor of plaintiff(s)

which ☐ includes        pre–judgment interest.
☐ does not include pre–judgment interest.

Post-judgment interest accrues on that amount at the rate provided by law from the date of this judgment.

Plaintiff(s) shall recover costs from defendant(s).

---

☒    in favor of defendant
and against plaintiff(s) Emily Elizabeth Lazarou et al

Defendant(s) shall recover costs from plaintiff(s)

---

☐    other:

---

This action was *(check one)*:

☐ tried by a jury with Judge        presiding, and the jury has rendered a verdict.
☐ tried by Judge      without a jury and the above decision was reached.
☒ decided by Judge Jeremy C. Daniel on 5/13/2024 on Defendants' motion to Dismiss [96,98].

Date:  5/13/2024                    Thomas G. Bruton, Clerk of Court
                                    A.J. Squillante, Deputy Clerk

**A-1**

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| EMILY ELIZABETH LAZAROU, and AAFAQUE AKHTER,       Plaintiffs | No. 19 CV 1614 |
| v. | Judge Jeremy C. Daniel |
| AMERICAN BOARD OF PSYCHOLOGY AND NEUROLOGY,       Defendant | |

### MEMORANDUM OPINION AND ORDER

The plaintiffs, licensed psychiatrists, filed a second amended class action complaint against the American Board of Psychology and Neurology (the "Board"), alleging that the Board violated federal antitrust statutes by unlawfully "tying" its maintenance of certification product to initial certification. (R. 94 ("SAC").) The Board now moves to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6). (R. 96; R. 98.) Because the second amended complaint does not cure the deficiencies identified in the Court's previous Memorandum Opinion, the Court grants the motion and dismisses the plaintiffs' federal claims with prejudice.

### BACKGROUND

The Board and its certification products are described at length in this Court's previous Memorandum Opinion. *See Lazarou v. Am. Bd. of Psychiatry & Neurology*, No. 19 C 1614, 2023 WL 6461255 (N.D. Ill. Oct. 4, 2023). To recap, the Board has a nation-wide monopoly on psychiatric and neurological certifications which, although not required to practice medicine in any state, are advantageous for obtaining higher

compensation and better malpractice coverage. (SAC ¶¶ 3, 4, 38, 52–74.) Although the organization used to grant certifications for life, in or around 2006, it began to require Board-certified doctors or "diplomates" to purchase a program called "maintenance of certification" or "MOC" to preserve their certification status. (*Id.*¶ 98.) If a certified psychiatrist or neurologist does not complete MOC's requirements, their certification will be revoked, thus depriving them of the associated advantages. (*Id.* ¶ 91, 98.)

As described in the second amended complaint, MOC consists of two components: "Activity Requirements" and an "Assessment." (*Id.* ¶¶ 100, 101.) To satisfy the Activity Requirements portion of MOC, participants must complete ninety continuing medical education or "CME" credits every three years. This requirement is further broken down into sixty-six "Category 1" CME credits and twenty-four "Category 2" CME credits. (*Id.* ¶ 100.) Category 1 and Category 2 are designations created by the American Medical Association ("AMA"), a third-party accrediting agency for CME products. (*Id.* ¶ 80.) Category 1 encompasses directed study activities, while Category 2 refers to self-assessment activities. (*Id.* ¶¶ 80–84.) MOC participants can earn Category 1 and Category 2 products by purchasing products from accredited CME vendors who have offered these products "for decades." (*Id.* ¶¶ 81, 100.) Participants can also obtain "direct credit" for unaccredited CME products by applying directly to the AMA. (*Id.* ¶ 82.)

The "Assessment" component of MOC requires participants to either complete an "Article-Based Pathway" assessment every three years or pass a "Recertification

Examination" every ten years. (*Id.* ¶ 101.) The Article-Based Pathway requires doctors to read medical journal articles and answer related multiple-choice questions. (*Id.* ¶ 102.) The Recertification Examination is a proctored, closed-book examination developed and administered by the Board. (*Id.* ¶ 103.) If a MOC participant successfully completes the Article-Based Pathway, then the Board waives sixteen of the twenty-four Category 2 CME self-assessment credits from the Activity Requirement. (*Id.* ¶ 105.) If a participant completes the Recertification Exam, the Board waives eight of the twenty-four self-assessment credits. (*Id.*)

Plaintiffs Emily Elizabeth Lazarou and Aafaque Akhter are licensed psychiatrists who claim that the Board's practice of requiring diplomates to purchase MOC to maintain their certification is unlawful. (*See id.* ¶¶ 152–57.) Lazarou's Board certification lapsed when she was unable to complete the Recertification Exam in 2017. (*Id.* ¶¶ 160–69.) Akhter remains certified, but complains about the additional "time, money, and effort" required to comply with MOC. (*Id.* ¶¶ 174–77.)

The plaintiffs contend that MOC is a separate product from initial certification and occupies the product market for CME products. CME products are sold to psychiatrist and neurologists after their residency training and specialist qualifications have been completed. (*Id.* ¶¶ 6–8, 92, 96.) They "promote individual, self-directed lifelong learning and the development of medical and non-medical competencies after residency . . . ." (*Id.* ¶ 76.) CME products are typically sold by third party vendors. (*Id.* ¶¶ 29, 75, 81, 100.) The plaintiffs allege that, "almost all states

require doctors to purchase a certain number of CME category 1 credits to maintain their licenses." (*Id.* ¶¶ 34, 83, 118.)

The plaintiffs claim that, by requiring diplomates to purchase MOC to preserve their certification status, the Board is using its monopoly power in the certification market to foreclose competition in the CME market. They allege that the arrangement is an unlawful tie that "thwarts competition in the CME market," "limits the choices of psychiatrists and neurologists in the CME market," and "prevents current and potential participants in the CME market from competing with [the Board] on a level playing field." (*Id.* ¶¶ 228–31.) Additionally, because several states now accept MOC in lieu of CME requirements for state licensure or allow Category 1 CME credits earned as part of MOC's Activity Requirement to satisfy state CME requirements, the plaintiffs claim that MOC reduces competition in the market for CME products used to maintain state licensure. (*Id.* ¶ 118–24, 196.)

The plaintiffs filed this putative class action lawsuit alleging violations of § 1 of the Sherman Antitrust Act. 15 U.S.C. § 1. (*See generally id.*) The Court dismissed the plaintiffs' previous complaints due to failure to plausibly allege cross-price elasticity between MOC and other CME products. (R. 60; R. 87.) The plaintiffs have now filed a second amended complaint, and the Board again moves to dismiss. (R. 96; R. 98.) Because the second amended complaint does not cure the deficiencies previously identified, the Court grants the Board's motion and dismisses the plaintiffs' antitrust claims with prejudice.

## LEGAL STANDARD

To state a claim, a complaint must contain a "short and plain statement . . . showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The complaint must give the defendant fair notice of what the claim is and the grounds upon which it rests. *Erickson v. Pardus*, 551 U.S. 89, 93 (2007).

A Rule 12(b)(6) motion challenges the sufficiency of the complaint. *Berger v. Nat'l Collegiate Athletic Ass'n*, 843 F.3d 285, 289–90 (7th Cir. 2016). When considering a motion to dismiss under Rule 12(b)(6), the Court must construe the complaint "in a light most favorable to the nonmoving party, accept well-pleaded facts as true, and draw all inferences in the non-moving party's favor." *Bell v. City of Chi.*, 835 F.3d 736, 738 (7th Cir. 2016). A party need not plead "detailed factual allegations," but "labels and conclusions" or a "formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A complaint must contain sufficient factual matter that when "accepted as true . . . 'state[s] a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). Ensuring compliance with this standard is particularly important in the antitrust context to avoid 'the potentially enormous expense of antitrust discovery in cases with no reasonably founded hope' of success." *Siva v. Am. Bd. of Radiology,* 38 F.4th 569, 573 (7th Cir. 2022) (quoting *Twombly*, 550 U.S. at 579).

## ANALYSIS

"A tying arrangement" that violates § 1 of the Sherman Act "is 'an agreement by a party to sell one product but only on the condition that the buyer also purchases

a different (or tied) product.'" *Siva,* 38 F.4th at 573 (quoting *N. Pac. R. Co. v. United States*, 356 U.S. 1, 5 (1958)). To state a tying claim, the plaintiffs must allege: (1) the existence of an arrangement that involves "two separate products or services"; (2) that the defendant has "sufficient economic power" in the tying product market to restrain free competition in the tied product market; (3) that the tie affects "a not-insubstantial amount of interstate commerce in the tied product"; and (4) that the defendant has some economic interest in the sales of the tied product. *Id.* at 573.[1]

Although the Board does not dispute that certification and CME occupy distinct product markets, and that the Board has a monopoly in the certification market, it argues that MOC is not truly a CME product. (R. 99 at 5–12.) And without plausible allegations that MOC is a CME product, the plaintiffs' theory that MOC is a separate product from certification collapses. (*See id.*)

As before, the Seventh Circuit's decision in *Siva* is instructive. There, the Seventh Circuit affirmed dismissal of tying claims challenging the American Board of Radiology's maintenance of certification product. 38 F.4th at 581. Noting that "[a] savvy lawyer can describe any product as a tie of its components, and any tie as a single product," the Seventh Circuit emphasized the need to "look through labels to substance" to determine whether a plaintiff has adequately alleged separate products under § 1. *Id.* at 572, 575.

---

[1] As in the first amended complaint, the plaintiffs assert both a *per se* tying claim and a claim pursuant to the rule of reason. (SAC ¶¶ 185–246.) "Because *per se* and rule of reason tying claims must satisfy common elements, we consider them together." *Lazarou*, 2023 WL 6461255, at *4 (citing *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 468 (7th Cir. 2020)).

Per *Siva*, to establish that MOC competes in the CME market, the plaintiffs must allege facts "making it plausible that MOC is a substitute for other [CME] products." *Id.* at 578 (citing *Reifert v. S. Cent. Wis. MLS Corp.*, 450 F.3d 312, 317 (7th Cir. 2006)). This is assessed "at the pre-contract rather than post-contract stage," *i.e.*, before the alleged tie is imposed. *Id.* at 574 (quoting *Viamedia*, 951 F.3d at 469). Because the inquiry assumes a "world without the tying agreement," the defendants cannot escape liability by arguing that MOC and certification are "essentially integrated," nor can the plaintiffs appeal to the potential revocation of their certification to bootstrap their claim. *Id.* at 577, 578. The question is whether MOC— stripped of any connection to certification—is "reasonably interchangeable" with CME products "in the minds of relevant consumers." *Id.* at 578 (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962)). In economic terms, this requires a plausible inference of "cross-price elasticity" or that, in a world without the tying agreement, an increase in the price of other CME products relative to MOC would shift sales to MOC. *Id.*

In *Siva*, the Seventh Circuit concluded that maintenance of certification was not a true substitute for other CME products because it imposed a "redundant obligation" on diplomates to purchase CME products from third parties. *Id.* The program was, in the Seventh Circuit's view, an empty vessel that contained none of the educational content characteristic of CME products. *Id.* ("The [] CME market is a market for educational content . . . but the MOC program contains no such content. MOC thus does not plausibly compete in the market for [] CME products.").

7

With that background in place, the Court now considers the tying claims at issue in this case. In their first amended complaint, the plaintiffs alleged that MOC required diplomates to take a closed book examination once every ten years and purchase a specified number of CME credits from an "approved product list." (R. 63 ¶¶ 186–90.) The plaintiffs alleged this framework placed "sellers of other [CME] products at a competitive disadvantage because psychiatrists and neurologists are discouraged from buying those products given the substantial economic cost of having their certifications revoked by [the Board]." (*Id.* ¶ 19.) The Court dismissed the plaintiffs' tying claims due to failure to allege separate products. *Lazarou*, 2023 WL 6461255, at *8. The Court noted that there were no allegations that the Board had an economic interest in the CME products on the approved products list. *Id.* at *6. The Court also observed the absence of allegations that any state required psychiatrists or neurologists to purchase MOC to fulfill these CME requirements for licensure. *Id.* at *5–6.

In the second amended complaint, the plaintiffs omit any reference to an "approved products list," and instead refer only to quotas of sixty-six Category 1 credits and twenty-four Category 2 CME credits that diplomates must complete every three years. Although up to sixteen of these the Category 2 credits may be waived by completing MOC's Assessment (*i.e.*, the Article-Based Pathway or the Recertification Exam), MOC still requires participants to complete a minimum of seventy-four CME credits every three years. The complaint does not draw any distinction between Category 1 CME products that are required for state licensure and those required to

8

satisfy MOC's Activity Requirement. (*See generally id.*) Finally, while the complaint alleges that diplomates can apply to receive direct credit for non-accredited CME products, it tells us "next to nothing" about "a standalone market for non-accredited [CME] products." *Siva*, 38 F.4th at 579.

Critically, as in the first amended complaint, there are no allegations indicating that the Board provides accredited CME products to satisfy MOC's Activity Requirement, selects the courses or activities that participants must enroll in to obtain these credits, or has any interest (financial or otherwise) in which CME products MOC participants purchase to fulfill the Activity Requirement. *See generally* SAC; R. 104 at 15.) Indeed, the complaint indicates that CME products are accredited by third party entities that have "no role in [the Board's] sales of certifications to psychologists and neurologists." (*Id.* ¶ 32; *see id.* ¶¶ 5, 6, 80–82.) As before, the Activity Requirement appears to be a "redundant obligation" to purchase CME products from third parties. *Siva*, 38 F.4th at 579; *see also* Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 1709e5 (4th ed. 2015) (Areeda & Hovenkamp) ("The tying seller who lacks an economic interest in the tied market can hardly gain incremental revenue or exploit its customers in any additional way when it takes nothing from the seller of the second product.").

Although MOC itself is not an accredited CME product, the plaintiffs allege that diplomates may apply for Category 1 direct earned through their participation in MOC and use this credit to satisfy CME requirements for state licensure. (SAC

9

¶¶ 176, 177.) Specifically, Plaintiff Akhter alleges that he applied for and received sixty hours of Category 1 direct credit "[a]fter passing the ten-year MOC [Recertification Examination]" in 2014, and then used this direct credit to partially satisfy his state licensure requirements. (*Id.*) These allegations distinguish the second amended complaint from both the first amended complaint, as well as the complaint in at issue in *Siva*. *See Siva*, 38 F.4th at 580 ("Radiologists cannot earn CME credits by completing the weekly [] tests or practice improvement projects.").

To the extent that the plaintiffs' tying theory relies on drawing a connection between the direct credit system and the market for accredited CME products, it runs into several issues. The first problem is the lack of clarity as to what aspect of the MOC program gives rise to direct credit. In Akhter's case, the complaint gives no indication of whether he earned direct credit by *studying* for the Recertification Examination, or from *taking* the exam itself. If it is the former, then the credits Akhter received would not necessarily be attributable to the MOC, but rather to the activities or materials he used to prepare. And there is no allegation that the Board provides, selects, or has any interest in self-study activities or materials. While the Court is bound to draw all inferences in the plaintiffs' favor, the lack of clarity on this point is at odds with both the factual specificity demanded by *Twombly* and Rule 8's demand for a "short and plain statement."

Assuming that Akhter received sixty hours of direct credit merely because he took the Recertification Examination, it still does not follow that MOC is a plausible substitute for accredited CME products. In the first place, to receive Category 1 CME

credit for unaccredited CME products like MOC, diplomates must do the extra legwork of applying for credit from the AMA. Even if this process were costless, there is no indication that this direct credit can be used to satisfy MOC's *own* Activity Requirement. Indeed, Akhter, alleges he received "60 *additional* hours of Category 1 credits" from the AMA that were "over and above the credits he had already earned from his purchases of CME as part of MOC 'Activity Requirements.'" (SAC ¶ 177.) The plaintiffs further describe the CME credits obtained through the direct credit process as "additional" credits or "bonus points" "separate from whatever CME credits [diplomates] may earn directly from other CME providers as part of MOC." (SAC ¶¶ 118, 177); (R. 104 at 13); *see Heng v. Heavner, Beyers & Mihlar, LLC*, 849 F.3d 348, 354 (7th Cir. 2017) (providing that courts may consider elaborations of allegations in a plaintiff's response brief in deciding a motion to dismiss so long as they are "consistent with the pleadings.").[2]

Absent allegations that direct credit earned through MOC can be applied to satisfy MOC's own Activity Requirement as well as state licensure requirements, MOC is clearly a poor substitute for other accredited CME products. No psychiatrist looking to earn sixty hours of Category 1 CME credit would choose MOC over other accredited CME products, because—even if the diplomate successfully obtained sixty

---

[2] The possibility that diplomates can use direct credit obtained through a MOC assessment to satisfy the Activity Requirement also seems inconsistent with the structure of MOC that the complaint describes. Indeed, if diplomates could satisfy sixty credits of the Activity Requirement simply by completing a MOC Assessment and applying for direct credit from the AMA, what would be the purpose of requiring 90 CME credits for a given three-year period as opposed to a lower number? The fact that the Board already waives Category 2 credits for diplomates who complete the Assessment further supports the conclusion that diplomates cannot engage in "double-dipping" by applying direct credit earned through MOC toward the Activity Requirement.

11

hours of direct credit from the AMA—MOC would impose an additional obligation to obtain *ninety* CME credits from other providers. Although some of these credits would be waived if the diplomate completing the Assessment portion of MOC, the number of additional credits needed would still exceed the sixty hours of direct credit that Akhter alleges he obtained. On such facts, MOC would be simply creating a redundant (and excessive) obligation to obtain CME products. *Siva*, 38 F.4th at 579.

Even if plaintiffs could apply direct credit earned through MOC towards satisfying both state licensure requirements *and* MOC's own Activity Requirement (a fact that is alleged nowhere in the complaint), the sixty hours of direct credit earned would be insufficient to satisfy the ninety-credit Activity Requirement. In other words, MOC would still require diplomates to purchase additional CME products from third party vendors. Without allegations comparing the number of additional CME credits needed to satisfy MOC to the baseline requirement for state licensure, the Court cannot infer that the number of additional CME credits required by MOC would be less than the number of CME credits that a licensee would need to purchase in the absence of MOC (thus rendering MOC a plausible substitute). In Akhter's case, the complaint contains no factual detail about the number of CME credits required for state licensure in *any* state where he is licensed, thus precluding the inference described above. (*See generally* SAC.)

Finally, the Recertification Examination for which Akhter allegedly obtained direct credit is offered once every ten years. (*Id.* ¶ 101.) Even if Akhter could apply the direct credit to satisfy both the Activity Requirement and state licensure

requirements in a given three-year period, he would still need to purchase ninety credits worth of CME products in the subsequent three-year periods to maintain his certification. In the long run, this means that MOC is an implausible substitute for accredited CME products and poses no risk of completely "foreclosing competition in the market for [] CME products." *Siva*, 38 F.4th at 579; *see also Sheridan v. Marathon Petroleum Co. LLC*, 530 F.3d 590, 592 (7th Cir. 2008) (describing the "[t]he traditional antitrust concern" with tying agreements as the risk that the tie will create "a second monopoly" in the tied product market).

In sum, while it is possible to imagine circumstances in which the acceptance of direct credit could lead to customers substituting MOC for accredited CME products, such a theory relies on a daisy-chain of assumptions that the second amended complaint does not spell out in the sufficient detail. *See Twombly*, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level."). The complaint does not indicate what portion of MOC gives rise to "direct credit," whether direct credit can be applied to MOC's own Activity Requirement (in addition to state licensure requirements), or whether the acceptance of direct credit to satisfy state licensure requirements would, in a particular case, lead to diplomates purchasing less accredited CME products than they otherwise would. The plaintiffs' failure to plead sufficient detail on these points might be forgiven if this was their first or second attempt. But the plaintiffs have had multiple chances and have failed to do so in over 250 paragraphs of allegations.

13

Relatedly, the second amended complaint emphasizes that some states accept CME credits earned through MOC's Activity Requirement in complete or partial satisfaction of CME credit quotas required to maintain licensure. (SAC ¶¶ 118--24, 199(g); R. 104 at 17–19.) Again, while these allegations distinguish this case from *Siva*, they do not move the needle as to the sufficiency of the plaintiffs' tying claims. As in the first amended complaint, there are no allegations that any state *requires* MOC to maintain state licensure. Nor are there allegations that the Board places any limits on what Category 1 CME products diplomates can choose to satisfy MOC's Activity Requirement.

Without allegations that the Board sells, limits, or selects which CME credits that the plaintiffs must obtain as part of MOC, the fact that diplomates may use Category 1 credits obtained through MOC's Activity Requirement to satisfy state licensure requirements says nothing about whether a consumer would plausibly substitute MOC for other CME products in the first instance. This is because—as in *Siva*—MOC consists primarily of an obligation to purchase accredited CME content from third parties. The fact that doctors may earn CME Category 1 direct credit through the Assessment portion of MOC "and then apply those credits towards their state requirements," does not change this analysis, since, as indicated above, the number of additional CME credits required by MOC would exceed the number of direct credits diplomates may receive through this process. (SAC ¶ 120.)

That said, it is possible to imagine a scenario in which a state's acceptance of MOC as a total substitute for CME requirements *might* have anticompetitive effects

14

on the market for CME products. Suppose, for example, that a state required psychiatrists to obtain 120 CME credits every three years to maintain their license, but accepted MOC, which requires only ninety CME credits, in lieu of this 120-credit requirement. A psychiatrist who selected MOC to fulfill their state CME requirements would be purchasing thirty less CME credits than they otherwise would. Such a framework might harm competition by privileging MOC over other CME vendors in the eyes of consumers and reducing the overall demand for CME products. Put a different way, an increase in the price of CME products would shift sales to MOC, since MOC would require less CME credits to satisfy the same licensure requirements.

To the extent that the plaintiffs are asserting such a theory, it is insufficiently pled. The only states that allegedly accept MOC in total satisfaction of CME credit requirements for licensure are Idaho, Minnesota, Oregon, New Hampshire, and West Virginia. (SAC ¶ 119.) The complaint also alleges that California, Kentucky, and Michigan accept "passing a MOC examination [as] as substitute for some or all of the State's CME requirements." (*Id.* ¶ 121.) Importantly, the complaint contains no detail about the number of CME credits that these states require for licensure, thus precluding an inference that the acceptance of MOC harms competition in the manner described above. (*See id.*)

More fundamentally, neither of the plaintiffs are licensed in any of the states listed above, and therefore lack standing to assert claims based solely on these

product markets.[3] *See Viamedia*, 951 F.3d at 482 ("The general rule is that customers and competitors *in the affected market* have antitrust standing.") (emphasis added); *see also Lazarou*, 2023 WL 6461255, at *5 ("The First Amended Complaint does not allege that MOC would satisfy Plaintiffs' continuing education requirements for practicing as licensed psychiatrists *in their respective states*.") (emphasis added); *see also Gonzalez v. Thaler*, 565 U.S. 134, 141 (2012) ("When a requirement goes to subject-matter jurisdiction, courts are obligated to consider *sua sponte* issues that the parties have disclaimed or have not presented.").

Considering only the states in which the plaintiffs are licensed, their allegations are insufficient to state a claim. For example, Plaintiff Lazarou alleges that she is licensed in Illinois, which "requires doctors to purchase 60 hours of CME Category 1 credits every three years." (SAC ¶ 83.) The complaint does not allege that Illinois accepts Category 1 CME credits earned in connection with MOC to satisfy this requirement. (*See generally id.*) Nor is there a plausible explanation why—in a world where MOC is not tied to certification—doctors in Illinois would substitute MOC, which requires participants to purchase ninety CME credits, to satisfy Illinois' baseline requirement of sixty CME credits.

---

[3] Lazarou is licensed in Florida, Texas, Mississippi, and Illinois (SAC ¶ 157), and Akhter is licensed in Connecticut, Florida, Hawaii, Massachusetts, and New York. (*Id.* ¶ 172.) While the plaintiffs allege that the market for CME products is nationwide, (SAC ¶ 75), the Court is not bound to accept conclusory allegations regarding product market definition. *See, e.g.*, *House of Brides, Inc. v. Alfred Angelo, Inc.*, No. 11 C 7834, 2014 WL 6845862, at *4 (N.D. Ill. Dec. 4, 2014). To the extent that the plaintiffs' tying theory is based on state licensure requirements, it is appropriate to consider standing on a state-by-state basis, as the plaintiffs are not "consumers" of accredited CME products required for licensure in states where they are not licensed. *Viamedia*, 951 F.3d at 482.

16

Similarly, Plaintiff Akhter alleges that he is licensed in Massachusetts, which "require[s] a specified number of CME Category 1 credits" for licensure and allows licensees to "apply [MOC] credits toward State CME Category 1 requirements." (SAC ¶ 120.) As with other states, the complaint does not state how many credits are required for licensure in Massachusetts or how MOC credits are counted relative to this baseline requirement. (*See generally id.*) Without such factual detail, the Court cannot infer that Massachusetts' policy of accepting MOC credits reduces competition in the CME product market. *Twombly*, 550 U.S. at 555.[4]

Finally, the plaintiffs allege that, via the Interstate Medical Licensure Compact, doctors licensed in states that accept MOC in lieu of compliance with CME requirements can apply to practice medicine in other states regardless of what those other states' CME credit requirements might be. (SAC ¶¶ 123–24.) Because this theory relies on the inference that substituting MOC's CME requirements for those required by state licensing entities is anticompetitive, and because there are insufficient facts upon which to conclude that the acceptance of MOC restricts competition for CME products in any state, these allegations do not render the plaintiffs' tying claims any more plausible.

The upshot is that the plaintiffs have once again failed to plead sufficient facts to suggest that MOC is a CME product, or that there is a "distinct product market in which it is efficient to offer MOC separately from certification." *Siva*, 38 F.4th at 581

---

[4] The complaint alleges no facts about any of the remainder of the states in which the plaintiffs are licensed, thus precluding an inference that the acceptance of MOC harms competition in these states. (*See generally* SAC.)

(quoting *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 21–22 (1984)). Like the MOC program in *Siva*, the MOC program described in the second amended complaint is primarily a requirement that participants to obtain educational content rather than a vehicle for providing that content. Even if MOC has *some* educational content by virtue of its Assessment component, the amount of this content, when considered in light of the program's other requirements, is not enough to plausibly render MOC a substitute for CME products. This point is underscored by surveys cited in the complaint indicating that as many as 75% of surveyed physicians agreed that MOC had "no significant value . . . beyond what is already achieved from continuing medical education." (SAC ¶ 142); *see also* Areeda & Hovenkamp ¶ 1750a ("The second item [in an alleged tying scheme] is a 'phantom product' when no buyer of the first item would want the second because it adds no value to the first.").

The Court "does not doubt the sincerity of [the plaintiffs'] frustrations with the MOC program." *Siva* 38 F.4th at 580. On the plaintiffs' view, MOC disadvantages working physicians by forcing them to pay fees that they otherwise would not have incurred, or by taking valuable time away from patient care. (*See* SAC ¶¶ 136, 142, 176.) These concerns, however legitimate, are not antitrust harms. *Siva*, 38 F.4th at 580 (quoting *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 16 (1984) ("[W]hen a purchaser is 'forced' to buy a product he would not have otherwise bought even from another seller in the tied product market, there can be no adverse impact on competition because no portion of the market which would otherwise have been available to other sellers has been foreclosed."). Whether MOC is a sound policy of

accrediting physicians is a separate question from whether it restricts competition in the CME product market.[5] Since the second amended complaint does not plausibly allege the latter, the plaintiffs' tying claims fail.

Since the plaintiffs have once again failed to plead separate products under *Siva*, the Court grants the Board's motion to dismiss and does not reach the parties' other arguments. A district court is not required to grant leave to amend "when a plaintiff has had multiple opportunities to state a claim upon which relief may be granted." *Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328, 347 (7th Cir. 2012). Accordingly, the dismissal is with prejudice. *Bank of Am., N.A. v. Knight*, 725 F.3d 815, 818–19 (7th Cir. 2013) ("[I]n court, as in baseball, three strikes and you're out"). The Court declines to exercise supplemental jurisdiction over the plaintiffs' state law unjust enrichment claim. *See Thomas v. City of Chi.*, No. 20 C 4323, 2021 WL 1923406, at \*4 (N.D. Ill. May 13, 2021) (citing 28 U.S.C. § 1367(c)(3)).

---

[5] Similarly, the plaintiffs' allegations concerning the Board's increased revenue from MOC (*See* SAC ¶¶ 145–47) are irrelevant. *See Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004) ("The mere possession of monopoly power, and the concomitant charging of monopoly prices, is not only not unlawful; it is an important element of the free-market system").

**CONCLUSION**

For the reasons stated in this Memorandum Opinion and Order, the defendant's motion to dismiss [96, 98] is granted and the plaintiffs' antitrust claims are dismissed with prejudice. The Court declines to exercise supplemental jurisdiction over the plaintiffs' unjust enrichment claim. 28 U.S.C. § 1367(c)(3). Civil case terminated.

Date: May 13, 2024

_____
JEREMY C. DANIEL
United States District Judge

20